**FIRST BAPTIST CHURCH OF GLEN ESTE, et al., Plaintiffs,**

v.

**STATE OF OHIO, et al., Defendants.**

Civ. No. C–1–82–1403.

United States District Court,
S.D. Ohio, W.D.

Oct. 24, 1983.

George R. Rawlings, Henry V. Sanders, Fred Valentine, Cincinnati, Ohio, for plaintiffs.

Thomas L. Blust, Batavia, Ohio, Rita Eppler, Columbus, Ohio, for defendants.

## OPINION

DAVID S. PORTER, Senior District Judge.

### I.

This is an action pursuant to 42 U.S.C. § 1983. Plaintiffs are an independent Baptist Church and several named members of the Church, including the minister, Reverend E. Paul Miller and three deacons. The remaining defendant is the Honorable Louis J. Schwartz, Judge of the Common Pleas Court of Clermont County, Ohio.

The gravamen of plaintiffs' case is that the Common Pleas Court, by the issuance of certain orders in state court proceedings, assumed *de facto* control of internal church matters. This state action is alleged to constitute excessive entanglement with religious matters proscribed by the Establishment and Free Exercise Clauses of the First Amendment. In a Memorandum and Order filed May 13, 1983 (doc. 17), we granted defendants' motion to dismiss plaintiffs' complaint insofar as it requested that this Court vacate certain judgments issued by Judge Schwartz in the state court proceedings. Our dismissal was premised on a finding that such relief was barred by the Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, which dictate that a federal court abstain from intervention in "ongoing" state court proceedings in certain circumstances. We reserved decision with respect to plaintiffs' request for prospective injunctive and declaratory relief pending further development of the record.

A conference in this matter was held on June 13, 1983. Present were defendant Schwartz, his counsel and counsel for plaintiffs. At that time, the parties agreed that the case would stand submitted to the Court for decision based on the pleadings and other documents of record, without further hearing (doc. 17 at p. 2).

## II.

With respect to the events leading to plaintiffs' federal claim, we adopt the statement of fact set forth in our previous memorandum and order (doc. 17), which we will now restate for the sake of convenience.

Plaintiff First Baptist Church [hereinafter "Church"] is a congregational church,[1] wholly independent of any other religious body. On January 18, 1981, thirty-six members of the Church [hereinafter "the dissident members"] attempted to remove Reverend E. Paul Miller as pastor, but a majority of the members voted to keep Reverend Miller. The dissident members resigned from the Church and started their own assembly in March of 1981, but returned to services at the Church in June. Disorder and disruption of services occurred in the wake of the dissident members' return.

In September, 1981, the Board of Deacons and Reverend Miller initiated proceedings under the Church Covenant and Constitution to place the dissident members in an inactive membership status. More serious disorder at the Church ensued and the police were called on two occasions to preserve order. On September 20, 1981, the Deacons and Pastor announced that the Church Body would vote on October 4, 1981, on whether to exclude the dissidents from the Church. This action is considered by the pastor and deacons to be an ecclesiastical or spiritual matter under the Church Covenant.

Some thirteen days prior to the scheduled vote, the dissident members filed a complaint[2] in the Common Pleas Court of Clermont County, Ohio, asking for a temporary and permanent restraining order prohibiting the Church from further disciplining them and restoring them to active member status. Defendant Schwartz issued a restraining order granting the relief requested by the dissident members on September 22, 1981. The restraining order was continued after a hearing on October 4, 1981.

The dissident members again returned to services, and the disruptions worsened. At the behest of counsel for the Church, Judge Schwartz issued a second restraining order on December 2, 1981, which provided, in part, that the Church was restrained from:

> Engaging in any Church business by way of nomination and voting of members, including disciplinary measures, and nominating and voting upon business matters of the Church, save and except normal operating expenses required to be paid upon a monthly basis. (doc. 4, exhibit C).

After a hearing on December 19, 1981, the restraining order was continued until it was dissolved by Judge Schwartz some six months later.

By agreement of the Church's counsel and counsel for the dissident members, the dispute was referred to a panel of arbitrators pursuant to a local court rule. In a judgment entry of June 18, 1982, Judge Schwartz adopted the findings of fact and conclusions of law of the panel, binding all parties to the decision of the arbitrators (doc. 4, exhibit A). Incidentally, the panel was composed of three attorneys, one of whom was also a minister, and their work

---

**1.** In *Graffam v. Wray*, 437 A.2d 627, 632 n. 6 (Me.1981) the court observed:

> Three general categories of church polity have been defined in Note, *Judicial Intervention in Disputes Over the Use of Church Property*, 75 Harv.L.Rev. 1142, 1143–44 (1962) as follows:
> At least three kinds of internal structure, or 'polity,' may be discerned: congregational, presbyterial, and episcopal. In the congregational form each local congregation is self-governing. The presbyterial polities are representative, authority being exercised by laymen and ministers organized in an ascending succession of judicatories—presbytery over the session of the local church, synod over presbytery, and general assembly over all. In the episcopal form power reposes in clerical superiors, such as bishops. Roughly, presbyterial and episcopal polities may be considered hierarchical, as opposed to congregational polities, in which the autonomy of the local congregation is the central principle. (Footnotes omitted).

**2.** Case No. 81 CV 0626 in the Court of Common Pleas, Clermont County, Ohio.

product shows that they were extremely conscientious in their performance of their duties.

The arbitration panel found that notice to the dissidents of impending disciplinary action should have been sent by the Clerk instead of the deacons and Minister (exhibit A, doc. 4). They also found certain provisions of the Church By-laws vague, and wrote procedural "due process" provisions to be followed by the Church with respect to member discipline and expulsion proceedings. The dissident members were restored to active status until "a proper determination ... [could] be made, affording due process to the [dissidents] ... pursuant to the [due process provisions] ... as to whether disciplinary charges should be pending ...." (Exhibit A, Findings of Fact and Conclusions of Law.)

Less than one month after Judge Schwartz' judgment ordering the parties to abide by the arbitration decision, the Church "determined that the Covenant, Constitution and By-laws drawn up by the Common Pleas Court were confusing" (doc. 4 at p. 8). On July 11, 1982, the Church, by a majority vote, amended portions of its Covenant, Constitution and By-laws and expelled the dissidents, allegedly in accordance with the amended documents.[3] Eleven days prior to their expulsion, however, the dissident members petitioned the Common Pleas Court to hold Reverend Miller in contempt, alleging that he had failed to comply with the judgment rendered in June, 1982 and with the earlier restraining order.

A hearing was conducted on the contempt motion in August, and some three months later (November 8, 1982), Judge Schwartz held Reverend Miller in contempt for failure to comply with the Court's June, 1982 judgment (exhibit B, doc. 4). Reverend Miller was given a suspended $500 fine. Judge Schwartz further said in his decision that "[i]f contemptuous conduct were to continue in the future, further sanctions may be taken not only against Reverend Miller, but other members of the Congregation and his supporters as well." [3A]

The dissidents attempted to attend services on November 21, 1982, but the services were cancelled. It appears that at some point thereafter, services were resumed. Instead of appealing the contempt order, plaintiffs, through new counsel filed the instant case seeking relief pursuant to 42 U.S.C. § 1983 on December 1, 1982.

This Court held an in-chambers conference with counsel on December 29, 1982 (*see* transcript of proceedings, doc. 10), where it was learned through counsel for Judge Schwartz that there would be no further Order regarding the suspended contempt fine against Reverend Miller and that no other proceedings were pending in the Common Pleas Court. Counsel further represented that Judge Schwartz agreed to

---

**3.** *See* affidavit of plaintiffs Reverend E. Paul Miller, Bernard Johnson, Albert Allen and Lloyd Wile, Pastor and Deacons respectively of plaintiff Church. Nothing before this Court rebuts plaintiffs' assertion that the dissidents were expelled in accordance with the Church Covenant, Constitution and by-laws *as amended* on July 11, 1982.

**3A.** An insight as to why Judge Schwartz held the minister in contempt was gained at the conference of May 27, 1983. For one thing, the internal disputes in this particular church group have gone on for years. They consistently ignore pleas such as those of the arbitrators and Judge Schwartz that they practice what they preach and reconcile their differences short of violence and seeking court intervention. After listening to the testimony and viewing video tapes, Judge Schwartz became convinced that the minister never gave the dissidents any reasonable opportunity to explain their side of ongoing disputes. He also became convinced the minister was acting in a high-handed manner, though the minister went through certain motions for the sake of appearances. Judge Schwartz became convinced the dissidents were being denied the basic right to say what they thought. The minister let the dissidents get up and talk, but if they said much they were found to be off limits (tr. 9–10).

In view of this history, little hope is held that the declaratory judgment we issue will help the congregation. Even the minister's leaving may not help. Though it proves to be an exercise in futility from that standpoint, it is still necessary to issue a declaratory judgment under the circumstances.

"preserve the status quo" during the pendency of the proceedings in federal court. Plaintiffs subsequently filed affidavits in support of their claim of continuing imminent and irreparable harm (docs. 14, 16), claiming members fear going to jail, and detailing the deleterious effects suffered by the Church since the November, 1982 contempt order was issued.

We write not only because we have to, but in the hope that conclusions reached after extensive research will be helpful to Judge Schwartz in case he is again asked to intervene in the affairs of this congregational church.

### III.

Two matters must be addressed preliminarily:

■ A. In his motion to dismiss (doc. 7), defendant Schwartz argued that the dissident members of plaintiff Church are "necessary parties" under Rule 19(a), Fed.R. Civ.P., in that "complete relief cannot be afforded in their absence." In raising this issue, the defendant assumed that any relief granted by this Court will necessarily bind the dissident members. Defendant also argues that judicial economy dictates that all rights and obligations emanating from the Church dispute be resolved in one, (i.e., the federal) action.

This Court has no jurisdiction over the subject matter of the state court proceedings independent of the present controversy, which is directed solely at plaintiffs' claim of unconstitutional "overreaching" on the part of the defendant judge. Defendant would have this Court in essence work a transfer of a matter which is properly before the state court to a federal forum.[4] The judgment we enter in this matter is our attempt to define the permissible scope of judicial review of internal disciplinary matters in a congregational church. Because the relief to which the dissidents are entitled, if any, is properly afforded by the state court, the dissidents are not "persons needed for just adjudication" under Rule 19.

■ B. Although the defendant has not pressed the issue of absolute judicial immunity from suits under 42 U.S.C. § 1983, it is worth noting that plaintiffs do not seek money damages in the instant case. State judges are absolutely immune from damage recoveries predicated on § 1983 violations. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). The weight of authority, however, suggests that judges are not absolutely immune from prospective declaratory or injunctive relief with respect to their judicial acts. *See Heimbach v. Lyons*, 597 F.2d 344 (2d Cir.1979); *Timmerman v. Brown*, 528 F.2d 811 (4th Cir. 1975); *Spark v. Duval County Ranch Co.*, 604 F.2d 976 (5th Cir.1979), *aff'd*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Harris v. Harvey*, 605 F.2d 330 (7th Cir. 1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980).[5]

■ We decline to hold that the doctrine of absolute immunity bars plaintiffs' claim for prospective equitable relief in the context of this case, which implicates important First Amendment rights. At the same time, however, it is well to remember that comity between the federal and state courts is an exceptionally important concern which we do not treat lightly. If we appear somewhat reluctant to become involved in this sensitive matter, we know that our concern is shared by Judge Schwartz, who attempted to resolve, in his best judgment, what the courts have recog-

---

4. Our research uncovered few church cases filed in federal court, presumably because federal jurisdiction is rarely present *ab initio*. Countless church cases have come before state courts. *See* Annot., 20 A.L.R.2d 344, and the cases cited therein.

5. *See also Allen v. Burke*, 690 F.2d 376 (4th Cir.1982), *cert. granted*, 461 U.S. 904, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983). The Supreme Court will consider whether judges enjoy absolute immunity from prospective equitable relief, as well as from damages in a § 1983 case.

nized as the most intractable of disputes—a church fight.

## IV.

In *Graffam v. Wray*, 437 A.2d 627, 631 (Me.1981), the Supreme Judicial Court of Maine observed:

For centuries judicial tribunals have been reluctant to intervene in controversies arising out of religious disputes. Likewise, the trial courts have been cautioned repeatedly not to delve into the resolution of ecclesiastical doctrinal controversies. *See Protestant Episcopal Church in the Diocese of New Jersey v. Graves*, 83 N.J. 572, 576, 417 A.2d 19, 22 (1980), *cert. denied*, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).

Disputes over church property, however may be resolved in the civil courts. As stated by the Supreme Court of the United States in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Presbyterian Church*, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969), 'Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.' In settling such disputes, however, the courts must not inquire into the underlying controversies over religious doctrine which may have led to the dispute.

*See also Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). *See generally* L. Tribe, American Constitutional Law § 14–12 (1978).

Judge Schwartz has indicated that there is no church property dispute involved in the state court proceedings. Those proceedings focused on the propriety of internal disciplinary matters which led to the expulsion of dissident members from a congregational church.

With respect to congregational church disciplinary matters, the courts have frequently been called upon to decide cases involving allegations of procedural defects in the conduct of the local church meeting at which the decision on the disputed matter was made. *See* Ellman, *Driven from the Tribunal: Judicial Resolution of Internal Church Disputes*, 69 Calif.L.Rev. 1378, 1381 (1981). Some courts have taken an "activist" view, insuring that the congregation has followed established procedures in disciplinary proceedings. According to this view, there is no reason to treat independent religious organizations any differently than other nonprofit voluntary associations. *See Baugh v. Thomas*, 56 N.J. 203, 265 A.2d 675 (N.J.1970). Other courts have adopted a much more restrictive view, holding that they are "compelled by the First Amendment to avoid adjudicating the issue of whether [a dissident member's] expulsion was in accordance with [church governing documents]...." *Nunn v. Black*, 506 F.Supp. 444 (W.D.Va.) *aff'd mem.*, 661 F.2d 425 (4th Cir.1981), *cert. denied*, 454 U.S. 1146, 102 S.Ct. 1008, 71 L.Ed.2d 299 (1982). *See also Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir.1974).

It has been advocated that courts may properly review whether a congregational church followed its own constitution and by-laws, and afforded fundamental due process in disciplinary proceedings by employing "neutral principles of law" (i.e., the law governing voluntary associations) without adjudicating forbidden ecclesiastical matters. *Cf. Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 734, 96 S.Ct. 2372, 2392, 49 L.Ed.2d 151 (1976) (Rehnquist, J., dissenting) (hierarchical church). *See* Ellman, 69 Calif.L.Rev. at 1401 *et seq.* Support for this approach can be found in early decisions of the Supreme Court. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871); *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 21 L.Ed. 69 (1872).

The Supreme Court has not since addressed the permissible scope of review of church disciplinary matters in a congregational church. With respect to a hierarchical church, however, the Court has clearly espoused a "hands-off" policy when courts

are asked to review such matters. *See Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976).

The *Serbian* Court recognized that "questions of church discipline ... are at the core of ecclesiastical concern." *Id.* at 717, 96 S.Ct. at 2384. In the concluding paragraph of the opinion of the Court, Justice Brennan wrote:

> The First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.

*Id.* at 724–25, 96 S.Ct. at 2387.

Overruling its earlier decision in *Gonzalez v. Archbishop*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), the Court concluded:

> whether or not there is room for "marginal civil court review" under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.

*Id.* 426 U.S. at 713, 96 S.Ct. at 2382 [footnote omitted].

At least one federal district court has applied the dictates of *Serbian* to a dispute within a church lacking a hierarchical "judi-

ciary." *See Nunn, supra.*[6] The district court held:

> It is clear that the fact that the local church may have departed arbitrarily from its established expulsion procedures in removing the plaintiffs is of no constitutional consequence ... [*citing Serbian, supra*].... It is the very nature of religious matters that ecclesiastical decisions are accepted as articles of faith, as opposed to the rational, objective mode of analysis and procedure used in secular decision-making. Therefore, ... constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are ... hardly relevant to such matters of ecclesiastical cognizance ... [citing *Serbian*].

It is not altogether clear whether the Supreme Court, if confronted with an internal dispute within a congregational church, would follow the *Serbian* analysis in all respects. The early case of *Bouldin v. Alexander, supra,* intimates that fundamental notions of "due process" must govern the disciplinary acts of a congregational church ("[church trustees] ... cannot be removed from their trusteeship by a minority of the church society or meeting, without warning, and acting without charges, without citation or trial, and in direct contravention of the church rules."). However, because the "hands off" policy espoused by the *Serbian* Court is of constitutional dimension, we find it difficult to justify the application of a different standard where a congregational church is involved.

■ We do note, however, that it is implicit in *Serbian* that civil courts may properly be called upon to *identify* the supreme judicial body in a hierarchical church which is appointed by church law to render a binding decision in church disciplinary matters. We hold that this function applies as well to civil court review of the disciplinary proceedings in a congregational church.

---

6. The *Nunn* case involved a dispute within the Church of God of Prophecy in Collinsville, Virginia. The church was apparently a part of a larger religious society, but had "no structured decision-making process." 506 F.Supp. at 448.

■ With the foregoing in mind, we find that declaratory relief is appropriate in this case.[7] We hold, i.e., "declare":

■ 1. Church discipline is an ecclesiastical matter in a congregational church.

■ 2. Unless the internal disciplinary decisions of the plaintiff Church are tainted by fraud or collusion, or constitute an extreme violation of the civil rights of a disciplined member, civil court inquiry with respect to the underlying reasons for church disciplinary action is constitutionally impermissible.

■ 3. As a general rule, the affairs of a congregational church are governed by a majority of its members, unless church governing documents, to which the membership have agreed or consented to be bound, specify otherwise. This principle applies to internal church disciplinary matters, including expulsion.

■ 4. It is not beyond the scope of inquiry for a civil court to determine, in a proper proceeding, whether disciplinary action undertaken by the plaintiff Church was approved or executed by that body within the church required to take such action under the church covenant, constitution, or by-laws.

■ 5. The government of church matters is entrusted to the membership. Absent a special provision in the church governing documents, the majority of members of a congregational church is entitled to amend its constitution and/or by-laws as it sees fit. Civil courts may, in a proper proceeding, inquire whether internal governing documents were amended by that body within the church which has the authority to so amend.

■ 6. Civil courts must insure that an aggrieved church member has exhausted all internal "rights of appeal" before any inquiry is made into internal church matters. Only after such appeal rights have been exhausted can a court determine that the highest church judicatory body has spoken on the matter.

■ 7. Internal church disciplinary proceedings which are tainted by fraud or collusion when the church governing body acts in bad faith for secular purposes may be subject to civil court inquiry in a proper proceeding. The higher "burden of proof" typically applied to cases of fraud applies equally in this context. The scope of review is constitutionally limited so that the civil courts do not adjudicate ecclesiastical matters.

8. This judgment in no way governs civil court inquiry with respect to potential property disputes within plaintiff Church. *See Jones v. Wolf, supra.*

---

**7.** The propriety of injunctive relief in this case (i.e., to prohibit the issuance of future contempt orders by the state court) is hinged upon a finding of "'exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights.'" *Wooley v. Maynard,* 430 U.S. 705, 712, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977), quoting *Spielman Motor Co. v. Dodge,* 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935). We find that declaratory relief is sufficient to protect the constitutional rights of plaintiffs in this case.