[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 924 
William B. Lott, Jr., appeals from the denial of three motions, namely, a motion for a temporary restraining order ("TRO"), and two motions for rule nisi. We affirm.
The motion for a TRO was one of two documents Lott filed on July 19, 2004, seeking relief against the Eastern Shore Christian Center, an Assembly of God church located in Daphne ("the Church"), of which he was a member, and its senior pastor, Anthony Legear. The other document was a "Verified Petition to Obtain Discovery and Complaint for Other Relief" ("the discovery petition"). The discovery petition sought an order requiring the Church to make certain of its financial records available to Lott for inspection and copying. It also sought an order "[a]uthorizing counsel for [Lott] to conduct a deposition of Pastor Legear, following review of the [records]."
The motion for a TRO sought an order restraining the Church from taking disciplinary action against Lott, in particular, from taking disciplinary action in the form of "expulsion from Church membership." More specifically, the motion stated:
 "It is further demonstrated by verification of [Lott] that [the Church], in response to prior requests by [Lott] and other members sharing his concerns, for access to records as aforesaid that [the Church has attempted] to condition review of records on dismissal of this action, on limitation on rights of access and copying, and ultimately, when agreement could not be reached for access and copying of records, [the Church has] threatened the undersigned counsel to `address discipline of your clients which includes expulsion from the church membership'. . . ."
(Some emphasis added; some emphasis omitted.)
The following day, the trial court conducted a hearing on the discovery petition and the motion for a TRO. At the conclusion of the hearing, the trial judge orally granted the discovery petition, stating, in pertinent part:
 "I will enter an order allowing [Lott] to inspect and copy the financial records of the Church, which, I would assume, would be bank statements, credit card statements . . . and if they have maintained a ledger with journal entries, . . . that sort of stuff. . . . That would allow *Page 925 
[Lott] to obtain the information that he wants to obtain. . . ."
However, the court denied the TRO motion, stating, in part:
 "But I can tell you that this judge isn't going to get involved in the government of a church, because I don't think I have any jurisdiction over who is a member, or not a member, or what is contained in the constitution or the bylaws or anything of that nature. So the court is going to deny the application for the TRO respecting the restraining order from the church taking any action against the members to . . . discipline [them]."
(Emphasis added.)
Meanwhile, that same day, at a meeting of Legear and the other members of the Church's "official board,"[1] the board unanimously voted to "rescind and withdraw" the names of Lott and his wife "from the current membership roster." Lott was informed of the board's action by a letter dated July 20, 2004, which stated:
 "At a meeting today of the Official Board of Eastern Shore Christian Center it was the unanimous decision of said Board to rescind and withdraw your names from the current membership roster.
 "This decision is in compliance with both our Constitutional Documents and the Holy Scriptures which direct Church leaders in matters of spiritual conduct and oversight.
 "Bylaws — Article III-Sections 3 5 Discipline of Members; Severance of Membership; Article III-Section 1(d)
 "It is the observation of this Board that Bill and Edyie Lott have been aggressively contributing to the division within the Church Body — exhibiting a disruptive and divisive spirit contrary to the spirit of Christ and the character of goodness prescribed in the scriptures (Titus 3:1-15; Matt. 18:15-18; Proverbs 6:16-19; I Cor. 5:11). It is also very clear that the Lotts reject Pastoral leadership and are aggressively engaged in encouraging others in an attempt to further disrupt the congregation.
 "This Board, in behalf of the Congregation, hereby disqualifies your membership and removes your names from the Assembly rolls. Per the Constitution 
Bylaws of our Fellowship, those whose names have been removed may appeal to the Board in writing. Any review of such appeal and subsequent action by the Board will be considered final (By-laws — Section 5)."
(Emphasis added.)
The following day, July 21, 2004, Lott filed his first motion for a rule nisi, namely, a "Motion for Order to Show Cause Why Respondents Should Not Be Held in Contempt." It stated:
 "[Lott] moves the court for an order to show cause why [the Church and Legear] should not be held in contempt for failure to comply with the court ruling of July 20, 2004, providing that `any member' may inspect and copy financial records, and as grounds therefor shows as follows:
 "1. Following the court ruling, Member Steve Ingersoll has been refused access to inspect and copy records of [the Church] for the stated reason that only Mr. Lott could inspect and copy. This is inconsistent with the court's ruling. *Page 926 
 "2. [The Church and Legear] have also, in contravention of bylaws of [the Church], purported to terminate membership of Petitioner, William B. Lott, Jr., and threatened to terminate other members, without following notice and procedure required by bylaws and/or the Assembly of God organization. . . .
 "3. [The Church and Legear] have advised counsel that a special meeting on July 20, 2004, purported to terminate membership and [the Church and Legear] failed to provide at least fourteen (14) days notice as required by Article VIII, Sec. 2 and 3 of the bylaws. . . .
 "4. On enforcement of contempt powers, the court should set aside this membership action based on violation of [Lott's] property interests and due process rights. Jurisdiction is supported by Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331
(Ala. 2002), where the trial court action was affirmed, in setting aside a due process violation, where the church contravened its own procedures. The basis of the ruling was, in part, a consideration whether the church business in question `was preceded by adequate notice to the full membership. . . .' Id. at 336.
 "5. The court has jurisdiction to enter the requested relief in order to enforce its judgment of July 20, 2004, and punish the contempt of [the Church and Legear] in flagrant disregard and disrespect for the ruling of this court."
(Emphasis added.)
That same day, July 21, 2004, Lott's legal counsel received by facsimile a letter from counsel for Legear and the Church; that letter stated:
 "The Official Board of the [Church] met in a specially called meeting on July 20, 2004, and unanimously voted to sever your client's membership with the church for violation of the membership standards as set forth in the constitution and the exhibition of a disruptive and divisive spirit contrary to spiritual guidelines. . . .
 "A number of other individuals were subject to the same disciplinary action by the Church Board.
 "As your client is no longer a member of the [Church], he nor his representatives will be allowed to review and copy documents of the Church.
 "It is very unfortunate that the Church Board felt compelled to take such drastic action, but the unity of the Church is of foremost importance to the Board."
(Emphasis added.)
On July 23, 2004, Lott's counsel received another letter from the Church's counsel by facsimile transmission; that letter stated:
 "I have been contacted by numerous staff members and Board Members regarding your client's conduct. Mr. Lott has been harassing [Legear] on the phone, repeatedly going to the church premises and causing severe disruption, as well as attempting to involve the Daphne Police Department by having an officer appear at the church `to witness Bill "serving" documents upon a staff member.'
 "It is this irrational disruptive course of conduct that Mr. Lott and several other former members of the church have been engaged in that led [to] their severance. Please advise your client to immediately cease any further contact with [Legear] or the Board Members. Also, advise your client that he is no longer allowed on the premises of the [Church]. If he returns after warning, this activity will be considered a criminal trespass." *Page 927 
(Some emphasis added; some emphasis omitted.)
Meanwhile, on July 22, 2004, Lott filed a second "Motion for Order to Show Cause Why Respondents Should Not Be Held in Contempt." In addition to the grounds stated in the first motion, the second motion alleged: "Following receipt of the ruling in chambers on July 20, 2004 . . ., [the Church and Legear] have exhibited contempt for the court by refusing [Lott's] request for access and copying of records." On July 30, 2004, Lott filed a "motion to compel and request for sanctions."
The trial court denied the two rule nisi motions, and declined to rule on the motion to compel. On August 3, 2004, Lott appealed from that denial and from the denial of his motion for a TRO.[2] We will first consider the motion for a TRO, which sought to preempt any disciplinary action by the Church. Next, we will address the post-disciplinary show-cause motions, which sought to hold the Church and Legear in contempt for not allowing discovery on the basis of the disciplinary action taken, i.e., for not allowing discovery on the basis that Lott was no longer a member of the Church.
 I. The Motion for a TRO
The elements required for the issuance of a TRO are the same as the elements required for the issuance of a preliminary injunction. Butler v. Alabama Judicial Inquiry Comm'n,111 F.Supp.2d 1224, 1229 (M.D.Ala. 2000); United States v.Metropolitan Dade County, 815 F.Supp. 1475, 1477 (S.D.Fla. 1993).
 "A plaintiff seeking a [TRO] has the burden of demonstrating
 "`(1) that without the [TRO] the plaintiff would suffer immediate and irreparable injury; (2) that the plaintiff has no adequate remedy at law; (3) that the plaintiff has at least a reasonable chance of success on the ultimate merits of his case; and (4) that the hardship imposed on the defendant by the [TRO] would not unreasonably outweigh the benefit accruing to the plaintiff.'"
Ormco Corp. v. Johns, 869 So.2d 1109, 1113 (Ala. 2003) (quotingPerley v. Tapscan, Inc., 646 So.2d 585, 587 (Ala. 1994)) (emphasis added). "[A] petition for a temporary restraining order . . . addresses itself to the sound discretion of the trial court," Churchill v. Board of Trustees of Univ. of Alabama inBirmingham, 409 So.2d 1382, 1389 (Ala. 1982), overruled onother grounds, Ex parte Waterjet Sys., Inc., 758 So.2d 505 (Ala. 1999), and "[i]f no abuse of discretion is shown, [its] action will not be disturbed on appeal." Falk v. Falk, 355 So.2d 722,725 (Ala.Civ.App. 1978). Discretion is informed by the elements of a TRO, Chase Manhattan Bank v. Dime Savings Bank of NewYork, 961 F.Supp. 275, 276 (M.D.Fla. 1997), with particular reference in this case to the plaintiff's chance of success on the merits.
It is undisputed that the Church is incorporated under the Alabama Nonprofit Corporation Act, Ala. Code 1975, §§ 10-3A-1 to -225 ("the Act"). Lott sought access to the Church's books and financial records on the basis of § 10-3A-43, which provides:
 "Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, board of directors and committees having any of the authority of the board of directors; and shall keep at its registered office or *Page 928 
principal office in Alabama a record of the names and addresses of its members entitled to vote, directors and officers. All books and records of a corporation may be inspected by any member, director or officer, or his agent or attorney, for any proper purpose at any reasonable time."
(Emphasis added.)
Lott contends that it was both necessary and proper for the court to issue a TRO to preserve his membership in the Church, and, by extension, his right to inspect the books. "Unless the court acted to preserve [his] membership status quo, pending inspection," Lott insists, his "statutory right to inspect was rendered meaningless." Lott's brief, at 14. The trial court concluded that it had "no jurisdiction over the internal workings of a church group" under the facts of this case. Thus, the issue is whether the trial court exceeded its discretion in refusing to enjoin the Church from expelling Lott after he invoked his rights under § 10-3A-43. We hold that it did not.
Courts are constrained by the First Amendment of the United States Constitution from "intrud[ing] into a religious organization's determination of . . . ecclesiastical matters such as theological doctrine, church discipline, or the conformity of members to standards of faith and morality." Singh v. Singh,114 Cal.App.4th 1264, 1275, 9 Cal.Rptr.3d 4, 12 (2004) (emphasis added). "Of course, [Alabama] courts concerned with restraints under the First Amendment applicable to the states through the Fourteenth [Amendment] are bound by the authoritative interpretations of the First Amendment enunciated by the United States Supreme Court." 114 Cal. App.4th at 1280, 9 Cal.Rptr.3d at 16.
To be sure, this Court has reviewed the actions of churches in expelling members or electing officers. See, e.g., Yates v. ElBethel Primitive Baptist Church, 847 So.2d 331 (Ala. 2002);Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746
(Ala. 1976); In re Galilee Baptist Church, 279 Ala. 393,186 So.2d 102 (1966). Jurisdiction was exercised in such cases, however, only insofar as "to determine whether an election meeting of a church, or a similar meeting, was conducted so improperly as to render its results void." Yates,847 So.2d at 335-36 (the trial court properly invalidated an election of deacons, where the election meeting (1) was irregular in "several material respects"; (2) was conducted to circumvent a prior, unappealed injunction; and (3) involved no "issues of differences in religious faith," "creed," or "ecclesiastical doctrine"). SeeNixon, supra (in an appeal from the grant of the pastor's motion to dismiss filed pursuant to Ala. R. Civ. P. 12(b), former church members, alleging that they had been improperly expelled, were entitled to "present evidence" of invalidity or "[ir]regularity of the meeting" in which they were expelled); Inre Galilee, supra (court's inquiry was limited to whether the meeting convened for the pastor's removal was so irregular as to void the results).
Under certain circumstances, therefore, our courts have decided whether a church had acted in accordance with its established procedures. It does not follow, however, that a court may interfere in a disciplinary matter before the church acts. On the contrary, in an action to preempt church discipline, a federal district court has held that "[t]he mere expulsion from a religious society, with the exclusion from a religious community, is not a harm for which courts can grant a remedy." Grunwald v.Bornfreund, 696 F.Supp. 838, 840-41 (E.D.N.Y. 1988). See alsoAlexander v. Shiloh Baptist Church, 62 Ohio Misc.2d 79,592 N.E.2d 918 (1991). *Page 929 
Grunwald involved an action by Yudah Grunwald against Ben Zion Bornfreund and others, alleging that the defendants had engaged in a fraudulent investment scheme, in violation of state and federal law, including the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962. Grunwald v. Bornfreund,668 F.Supp. 128, 130 (E.D.N.Y. 1987). Grunwald moved for a writ of mandamus, "prohibiting the `Central Rabbinical Congress of the United States and Canada, its Rabbinical Court and its members' . . . from temporarily or permanently excommunicating [him]" from the "branch of Orthodox Judaism" of which he was a member.696 F.Supp. at 839. The threat of excommunication was allegedly intended to pressure Grunwald into dismissing his action.696 F.Supp. at 839-40. The court denied the motion and declined to issue the writ, explaining that "the threat of excommunication" was "not a harm for which courts will provide a remedy."696 F.Supp. at 840.
As exemplified by Grunwald, this case differs fundamentally from the cases cited by Lott, which involved no disciplinary issues, or which involved post-expulsion procedural challenges. See, e.g., Mount Zion Baptist Church v. Second Baptist Church ofReno, 83 Nev. 367, 432 P.2d 328 (1967); Baugh v. Thomas,56 N.J. 203, 265 A.2d 675 (1970); Watson v. Christie,288 A.D.2d 29, 732 N.Y.S.2d 405 (2001).
The mere threat of expulsion, which is all the TRO motion in this case involved, obviously did not involve an issue regarding a secular, or neutral, procedural defect.[3] A challenge such as this one essentially alleges violation of a substantive
right, such as a right to be free from the arbitrary action of an ecclesiastical body. However, the United States Supreme Court has clearly stated that no such right exists. Serbian EasternOrthodox Diocese for the United States of America Canada v.Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151
(1976).
In Milivojevich, the Court considered whether the Illinois Supreme Court had properly invalidated the decision of the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church ("the Mother Church") to "defrock" Bishop Dionisije Milivojevich "on the ground that [the decision] was `arbitrary' because a `detailed review of the evidence disclose[d] that the proceedings resulting in Bishop Dionisije's removal and defrockment were not in accordance with the prescribed procedure of the constitution and the penal code of the Serbian Orthodox Church.'" 426 U.S. at 718, 96 S.Ct. 2372. The Court held "that the inquiries made by the Illinois Supreme Court into matters of ecclesiastical cognizance and polity and the court's action pursuant thereto contravened the First andFourteenth Amendments." 426 U.S. at 698, 96 S.Ct. 2372. In doing so, it explained:
 "The conclusion of the Illinois Supreme Court that the decisions of the Mother Church were `arbitrary' was grounded upon an inquiry that persuaded the Illinois Supreme Court that the Mother Church had not followed its own laws and procedures in arriving at those decisions. We have concluded that whether or not there is room for `marginal civil court review' under the narrow rubrics of `fraud' or `collusion' when church tribunals act in bad faith for secular purposes, no `arbitrariness' exception in the sense of an inquiry whether the decisions of the highest ecclesiastical *Page 930 tribunal of a hierarchical church complied with church laws and regulations is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense `arbitrary' must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them. . . .
 "`. . . .'
 "Indeed, it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of `fundamental fairness' or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance."
426 U.S. at 712-16, 96 S.Ct. 2372 (emphasis added; footnotes omitted). See also Kaufmann v. Sheehan, 707 F.2d 355 (8th Cir. 1983); Green v. United Pentecostal Church Int'l, 899 S.W.2d 28
(Tex.Ct.App. 1995).
Milivojevich involved the discipline of a bishop, rather than a church member such as Lott. Nevertheless, "[f]or essentially the same reasons that courts have refused to interfere with the basic ecclesiastical decision of choosing the minister . . ., this Court must not interfere with the fundamental ecclesiastical concern of determining who is and who is not [a Church] member."[4] Burgess v. Rock Creek Baptist Church,734 F.Supp. 30, 33 (D.D.C. 1990). See also Kral v. Sisters of theThird Order Regular of St. Francis, 746 F.2d 450 (8th Cir. 1984); Nunn v. Black, 506 F.Supp. 444, 448 (W.D.Va.) ("the fact that the local church may have departed arbitrarily from its established expulsion procedures in removing the plaintiffs is of no constitutional consequence, whether one appeals the First,Fifth, or Fourteenth Amendments"), aff'd, 661 F.2d 925 (4th Cir. 1981); Caples v. Nazareth Church of Hopewell Ass'n,245 Ala. 656, 660, 18 So.2d 383, 386 (1944) ("`we have no power to revise or question ordinary acts of church membership, or of excision from membership'").
Lott's motion stated no grounds for a TRO, other than an allegedly intractable disagreement over "rights of access [to] and copying [of] Church records." In seeking to preempt church discipline on these grounds, the motion for a TRO essentially invited the court to become embroiled in the merits of a "fundamental ecclesiastical concern" with which the courts must have nothing to do, namely, "determining who is and who is not [a *Page 931 
Church] member." Burgess, 734 F.Supp. at 33. Lott has cited no case preempting ecclesiastical discipline as he urged the trial court to do, and we have found none. Because Lott failed to show a "reasonable chance of success on the merits," the trial court did not err in denying his motion for a TRO.
 II. The Rule Nisi Motions
In his post-expulsion rule nisi motions, Lott sought to hold the Church in contempt of the trial court's discovery order. In the second such motion, Lott alleged that the Church "purported to terminate [his membership] . . . without following notice andprocedure required by bylaws [of] the Assembly of God organization, and governing Alabama Code provisions." (Emphasis added.) He also moved to "set aside the adverse membership action," thereby essentially reinstating his membership. These motions were also without merit.
"`[W]hether a party is in contempt of court is a determination committed to the sound discretion of the trial court, and, absent an abuse of that discretion or unless the judgment of the trial court is unsupported by the evidence so as to be plainly and palpably wrong, this court will affirm.'" Crawford v. Gay,703 So.2d 368, 371 (Ala.Civ.App. 1996) (quoting Stack v. Stack,646 So.2d 51, 56 (Ala.Civ.App. 1994)).
It is well established that "[a] church member attacking a church decision may not obtain civil court review of that decision without first exhausting the church's internal appeal procedures." Burgess, 734 F.Supp. at 35 n. 4 (citingMilivojevich, 426 U.S. at 710-11, 96 S.Ct. 2372). See alsoFirst Baptist Church of Glen Este v. Ohio, 591 F.Supp. 676
(S.D.Ohio 1983); State ex rel. Nelson v. Ellis, 140 So.2d 194,197 (La.Ct.App. 1962) ("an expelled member, seeking reinstatement, must first exhaust his Church's internal laws and procedure, before the Church's duly constituted officers").
It is undisputed that the Church bylaws provide an internal review procedure, which Lott has not yet exhausted. More specifically, in his "motion to compel and request for sanctions," Lott asserted that "[t]he termination is not final because an internal appeal to the [Church's] Board is pending." Thus, he could have no right to an order reinstating his membership pending the Church's review of his expulsion.
The inability of the trial court to interfere with the disciplinary action resolves Lott's final contention, that is, that the Church is in contempt because it denied him access to the premises, or to the Church records, on the ground that he is no longer a member. The issue is not whether he has standing to assert a substantive right, but whether that right has beenextinguished.
On appeal, Lott concedes that his statutory right of access to the Church records arises out of his membership. Lott's brief, at 9, 14, and 22. The inspection rights guaranteed by § 10-3A-43
are specifically limited to "any member, director or officer [of the Church], or his agent or attorney." (Emphasis added.) Lott does not claim to be a "director or officer" in the Church.
The trial court could not, consistent with First Amendment jurisprudence, preserve Lott's membership as this case was procedurally postured. The termination of Lott's membershipabated the right of inspection, pending a final resolution of the membership issue through the Church's appeal process. A contrary holding would be tantamount to a de factoreinstatement of membership, because it would compel the Church to treat Lott as a member despite his expulsion. This, the trial court could not do. *Page 932 
Finally, Lott seeks to assert the rights of certain nonparties, such as, "Member Steve Ingersoll." In that connection, Lott states: "Further, putative mootness of a representative's claim does not moot the entire action as long as other members have a controversy, under the `wrongs capable of repetition' standard." Lott's brief, at 26. For that proposition, he cites Moore v.Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), for the holding as cited in Rice v. Sinkfield, 732 So.2d 993, 994
n. 1 (Ala. 1998), namely, "that plaintiffs' challenge to state election law was not moot, even after the challenged election was completed, because the plaintiffs could challenge the law with respect to future elections." The cases are obviously distinguishable. One involves the generally indefeasible voting franchise, while the other involves a defeasible Church membership and a right contingent on that membership.
This is not a class action, and Lott is not a class representative. He is the only plaintiff of record. He is thus confronted with the well-established rule that "`a litigant may not claim standing to assert the rights of a third party.'" Exparte Izundu, 568 So.2d 771, 772 (Ala. 1990) (quoting JerseyShore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137,417 A.2d 1003 (1980)). "A party lacks standing to invoke the power of the court in his behalf in the absence of a `concrete stake in the outcome of the court's decision.'" 568 So.2d at 772 (quotingBrown Mech. Contractors, Inc. v. Centennial Ins. Co.,431 So.2d 932, 937 (Ala. 1983)). Absent membership in the Church, Lott has no stake in the outcome of any discovery claim asserted by Steve Ingersoll or any other Church member, should one ever be asserted. Lott has standing to seek enforcement of the discovery order only on his own behalf.
For these reasons, the trial court did not exceed its discretion in denying the rule nisi and related motions for contempt.
The orders of the trial court denying the motion for a TRO and the rule nisi and related motions are affirmed.
AFFIRMED.
NABERS, C.J., and HOUSTON, JOHNSTONE, and HARWOOD, JJ., concur.
[1] According to the bylaws of the Church, the board was to be composed of the senior pastor and "five men of mature Christian experience and knowledge" elected from the membership of the Church.
[2] The Church does not challenge the ruling on the discovery motion, which was resolved in Lott's favor.
[3] This is so, because, when the TRO motion was filed, there had been no expulsion procedure, defective or otherwise.
[4] It is generally held that the same considerations apply, regardless of whether the church has a congregational, rather than a hierarchical, form of government. First Baptist Church ofGlen Este v. Ohio, 591 F.Supp. 676 (S.D.Ohio 1983); Heard v.Johnson, 810 A.2d 871 (D.C. 2002); Callahan v. FirstCongregational Church of Haverhill, 441 Mass. 699,808 N.E.2d 301 (2004); Tubiolo v. Abundant Life Church, Inc.,167 N.C.App. 324, 605 S.E.2d 161 (2004).