WISE, Justice.
Lawton Higgs, Sr., formerly a pastor and pastor emeritus at the Church of the Reconciler (“COR”), a United Methodist church, brought an action in the Jefferson Circuit Court against Tom Bole, a lay member of COR, alleging defamation, invasion of privacy, and intentional infliction of emotional distress. During the proceedings, Higgs filed a civil subpoena requesting the production of certain documents from Reverend Ron Schultz, the district supervisor of the South Central District of the North Alabama Conference of the United Methodist Church (“the Conference”). Reverend Schultz filed a verified objection to and a motion to quash the civil subpoena based on First Amendment concerns. Subsequently, Bole filed a motion to dismiss the claims against him, alleging that the trial court did not have subject-matter jurisdiction over the claims based on the First and Fourteenth Amendments to the United States Constitution; the trial court denied Bole’s motion. The trial court later entered an order in which it granted in part and denied in part Reverend Schultz’s motion to quash. In case no. 1110868, Bole petitioned for a writ of mandamus requesting that this Court dismiss Higgs’s claims against him. In case no. 1110892, Reverend Schultz petitioned for a writ of mandamus asking this Court to quash the subpoena in its entirety on the basis that the records subpoenaed by Higgs were privileged, ecclesiastical records of the United Methodist Church. We grant the petition in case no. 1110868 and dismiss the petition in case no. 1110892.

Factual Background and Procedural History

Higgs served as the pastor of COR from 1998 until he retired in 2005. After he retired, Higgs continued to serve in the capacity of pastor emeritus and as a full-time volunteer at COR. His responsibilities as pastor emeritus were “[t]o be present, to give spiritual leadership and create an environment of hope and care for the participants there, particularly during the day program.” (Higgs’s deposition, at p. 14.) He also testified that he was the president of the Board of the Reconciler Development, Inc. (“RDI”), a nonprofit corporation committed to providing resources for the homeless and to raising funds to help support the operating budget of COR. Higgs’s son, Kevin Higgs (“Kevin”), was a senior minister at COR.
In his affidavit, Bole stated that he had served in COR’s ministry to the homeless, *43 had served on COR’s financial committee, had served on COR’s personnel board, and had served as COR’s banquet and auction chair. Bole stated that the pastor and board of COR had asked him “to undertake to organize its financial records” and that he “undertook to do so.” He also stated that in early 2011 Reverend Schultz asked him “to report to him on matters concerning the financial affairs and governance at COR.” On March 18, 2011, Bole wrote a letter to Reverend Schultz, stating:
“I currently serve on the Personnel Board and Finance Committee of COR. I have served the church for the past four years. During the past two years, I have attempted to introduce some changes regarding financial accountability and transparency. Having been a business owner of more than one business, I felt as though this was necessary in order for us to gain more financial support from the business community and from grant opportunities.
“During this period, though we have made progress, I have witnessed several accounting irregularities and a resistance to complete accountability and transparency. Examples include not being able to locate and track donations for specific projects. On 10/13/08, Reverend Lawton Higgs wrote a letter of gratitude to W.T. Ratliff [sic] of Collateral Mortgage for a $50,000 pledge for the construction of a shower and laundry facility. I have asked both Lawton and Kevin [Higgs] if this money was received and if so, what happened to it. Neither one can give me a definitive answer. Because at that time there were no meaningful accounting records, I have not been able to trace the funds. I suspect they were deposited in the account of Reconciler Development, a company for which no records have ever been made available. Collateral Mortgage is now out of business and Mr. Ratcliff [sic] has had all of his numbers disconnected.
“There has also been cash missing from the offering before it could be counted and deposited.
“In July of 2008, we received a $5,000 grant from Jefferson County for these same facilities. This was a non-pass-through grant[;] however, the money was comingled [sic] with the operating account. We had until 9/30/09 to render an accounting of the expenditures. This has not been done.
“The church received a $10,000 check from Mary Butterworth, also earmarked for the showers and laundry. These funds were also comingled with general operating funds and were never accounted for.
“The church received a $15,000 check from Crumly Chapel UMC and a $5,000 check from independent Presbyterian Church which were also comingled and unaccounted for.
“To my knowledge, there are no funds reserved for this project and it is clear that they were used to supplement operating expenses. Each time I try to create a trail for the flow of these funds, I am met with poor memories.
“There are other examples of this sort of financial management^] however, I would like to turn your attention to another disturbing matter. Many members and visitors, including myself, have complained about the political rhetoric that occurs during the Sunday sermon. Rather than preaching the Gospel, much of the sermon is either praising liberal politicians or deaminizing [sic] conservative ones. In fact, when Holy Scripture is read, names and places are replaced with political figures and cities with which they do not agree. Birmingham *44 City officials are called out and blamed for the plight of the homeless. They are also confronted in public demonstrations and interviews. Personal responsibility is rarely addressed. Many homeless people sleep during the service and some come in high on alcohol or drugs.
“In addition, many instances of sexual acts and the selling of drugs on church grounds and inside the building take place. The Higgsfes] refuse to hold these people accountable nor are we allowed to call the police. This behavior not only defiles God’s house but it is disturbing to volunteers and visitors, especially to the number of young people who are there.
“Lastly, there are a number of homeless veterans and several veterans who volunteer at the church, including myself and a very prolific financial supporter. Kevin has made it clear that he sees our government and our military as imperi-alistf] war mongers. I see this as a very divisive attitude.
“In closing, while I do not know what the answer is, I do know that there will soon be a mass volunteer exodus if changes are not made.”
Subsequently, Reverend Schultz sent a letter dated March 31, 2011, to Higgs. That letter stated, in pertinent part:
“This letter is to inform you in writing that an investigation is being conducted at Church of the Reconciler regarding recent allegations made in reference to yourself as Pastor Emeritus and the current Senior Minister. You are asked to remove yourself from activities at Re-conciler until you are informed that the investigation has been completed.”
The Conference issued a “Resolution of Complaint” (“the resolution”) dated May 23, 2011. The resolution stated, in pertinent part:
“It is normal procedure to suspend clergy while investigations are conducted. In this case however, in lieu of suspension, the Cabinet directed the Reverends Higgsfes] to step away from the ministry and take an extended vacation while the investigation was conducted. This was done so that Rev. Kevin Higgs’ medical insurance coverage and pension would remain intact.

“Findings

“The Bishop and Cabinet find the financial records of [COR] to be in shambles. The only clear and accurate financial statement that can be produced for this ministry is for the year 2010. There is evidence of carrying large credit debt on high interest credit cards, missing payments and incurring penalties, paying minimum payments and thus increasing the debt through high interest charges. There is also evidence that Rev. Higgs Sr. (Retired) overstepped his authority and directed [COR] funds to be used to pay debts incurred by a 501.3c [sic] entity established by Rev. Higgs Sr. to address housing needs of the homeless community. There is also evidence that on one occasion grant money was used by [COR] for needs other than those specified in the Grant.
[[Image here]]
“We find no evidence indicating a need to pursue formal charges against these ministers.

“Resolution

“The Complaint against Rev. Kevin Higgs and Rev. Lawton Higgs Sr. is hereby dismissed.”
On May 26, 2011, Reverend Schultz sent out an e-mail to several different recipients. The subject line of the e-mail was “Church of the Reconciler update.” In the e-mail, Schultz stated:
“Thank you for your patience over the last several weeks as the Disciplinary *45 process has been followed regarding the complaints filed against Kevin and Law-ton Higgs.
“I am pleased to share with you that the Bishop and Cabinet are satisfied that a just resolution has been reached and that no evidence has been found that would lead to judicial charges.
“Therefore the complaint is dismissed and Kevin remains a minister in good standing with the North Alabama Conference and Lawton remains in good standing in his retired relationship.
[[Image here]]
“As we move forward the following changes are being instituted:
“ * Kevin will be appointed to Brownsville United Methodist Church in the Central District.
[[Image here]]
“ * Lawton will no longer be connected to Church of the Reconciler in any capacity.”
It appears that Marti Slay, a member of COR, forwarded the message from Reverend Schultz to other recipients. On May 27, 2011, Mary Wade, a member of COR, sent an e-mail to various recipients. In her e-mail, Wade stated:
“If the charges or who knows what they are, have been dismissed, why are Kevin and Rachael [Martin] being relocated, and why is Lawton forever banned from COR? ? ?
“Is there any appeal process? If not, I am very perplexed about this process and outcome. I will not say more in an email.”
Later that same day, James Walker, a lay member of the Annual Conference from COR and a leader in the housing ministry, sent an e-mail to Wade and numerous other recipients. In his e-mail, Walker expressed his sadness at the loss of Kevin and Lawton at COR. He also stated:
“I know it is frustrating but in the United Methodist Church the Bishop has a pretty much absolute power to decide where to appoint clergy to local churches etc. Through the District Superintendent the Bishop consults with [Pastor Parish Relations] about the needs of the church as well as with affected clergy but in the end the Bishop decides.
[[Image here]]
“The issue of charges is really separate. It is more easily thought of as a personnel issue affecting ... Kevin’s standing as an ‘elder.’ Unlike in a congregational system where the two issues might be more directly linked and dealt with at the local church level, in the Methodist church ‘charges’ involve issues that affect a pastor’s standing to be a United Methodist pastor anywhere. In this context charges are not a local church issue. They are a conference personnel issue[] (a pastor is a member of an Annual Conference, not a local church) and are not appropriately discussed publicly out of concern for the reputation of the pastor and those directly involved in the specific issue.
[[Image here]]
“In this case it appears that Kevin and Lawton were cleared of any charges that would threaten their standing (membership) with the Annual Conference but the Bishop for whatever reason decided it was time for new leadership at [COR], Frustratingly we don’t have anything to say about this and I certainly think the conference should have done a better job explaining what was going on and what could happen as a result.”
On May 31, 2011, Bole sent an e-mail to Walker and numerous other recipients. In that e-mail, Bole stated:
*46 “I would like to comment, and I think you have said this in your own way, that the [District Superintendent] said that there was not sufficient evidence to bring ‘Judicial Charges,’ which can possibly result in dismissal from the church and the surrendering of their authority to minister. What he did not say, and purposely so, is that there was sufficient evidence of behavior that warranted their removal from COR. Advertising these things, as you have pointed out, will serve only to damage their reputation unnecessarily since they will continue to serve elsewhere.
“There have been acts of sabotage, disruption, theft, destruction of church property and withholding of support funds by certain individuals who were more committed to Kevin and Lawton than to the mission. This should outrage us more than a transfer of ministers. As you said, we cannot control who serves in God’s mission but we can control who you serve first.”
In response, Slay sent the following e-mail to Bole, Walker, and numerous other recipients:
“Tom,
“You have made so many blatantly false statements and distorted assumptions in your email that it is hard to know how to respond.
“My first response was ‘how dare you?’ How dare you impugn the integrity of Kevin and Lawton when the District Superintendent has stated the complaints have been dismissed? I am chair of the board and a member of the Staff Parish Relations Committee, and the only communication I have received concerning the resolution of this issue is the one I forwarded, with Bud’s approval, to a larger list of members and friends, so that, for the first time in this process, they would have some understanding of what is happening to our church. How is it that you have information about these complaints beyond what the leaders of the church know? If the Bishop and [District Superintendent] have declared that the complaints have been dismissed and Kevin remains in good standing, who are you to continue this destructive and divisive chapter of our church history by making public claims that keep the attack against our founding pastor and (until this week) current pastor alive?
“In your email, you attempt to make Jim Walker say things he did not say. I suggest you let him speak for himself. “You also make it sound as if you have knowledge of charges not shared in District Superintendent Ron Schultz’s email. You imply that the public has purposefully been kept in the dark about additional information concerning Kevin and Lawton, that additional information has been shared with the Staff Parish Relations Committee or someone else officially related to Church of the Recon-ciler. That implication is completely false. As I’ve already stated, there has been no other communication regarding Kevin and Lawton from the District Superintendent to the church, other than the one I have forwarded.
“And this communication from Ron Schultz is clear: There is no evidence of any kind which would lead to any charges against Kevin or Lawton.
“Your comments about ‘acts of sabotage, disruption, theft, destruction of church property and withholding of support funds’ intends to portray the members of Church of the Reconciler who support Kevin and Lawton as outlaws and criminals. Those of us who represent the overwhelming majority at the church, who support Kevin and Lawton and their leadership, have in no way behaved *47 in this manner. It is deeply offensive and false that you would portray us in this fashion. Whatever ‘acts of sabotage, disruption, theft, destruction of church property and withholding of support funds’ has happened is because of the chaos and disruption caused by the abrupt and mysterious removal of Kevin and Lawton and the resulting removal of their leadership among the homeless, following the frivolous complaints brought against them. Tom, you are part of a very, very small minority of people who are critical of the ministry of Kevin and Lawton Higgs and what they represent in their leadership at Church of the Reconciler. Your comments show your bias against them. Your email is offensive, and your statement has no basis in reality at Church of the Recon-ciler.
“I believe you owe a public apology to those of us who support Kevin and Law-ton and perceive that an injustice has been done. I also believe that you owe Kevin and Lawton a public apology. If Church of the Reconciler is to heal and move forward from these destructive, divisive, and unsubstantiated complaints, we must end this period of accusation, suspicion, and attack, and deal with each other in an open, honest, and loving manner.”
In response, on May 31, 2011, Bole sent an e-mail to Slay and numerous other recipients. In that e-mail, Bole stated:
“As I tried to express to you today at COR, I do know much more, more than I wish I knew but I cannot reveal it nor do I want to. I have no desire to see Lawton or Kevin hurt any further. I respect their heart and their mission for the homeless. That being said, as the [District Superintendent] explained to you, me and the others during our meeting with him, there are two types of investigations. Those which result in anything from a wrist slap, counseling to a transfer from their church. At this level, they would remain in good standing. The other, referred to as ‘judicial,’ which could result in stronger punishment such as removal from the ministry or even the church body. The [District Superintendent] specifically used the word ‘judicial’ when referring to the charges. It should be obvious that they removed them from COR for a reason but it would serve only to tarnish them further to elaborate on the reasons publicly.
“Regarding the acts of sabotage, they are real and documented. I did not say nor imply that you or anyone else you are defending had anything to do with it. You characterize the complaints against Lawton and Kevin as frivolous and mysterious. If they are mysterious how can you know if they are frivolous?
“I am not critical of their ministry as you claim. As I said, their heart was in the right placet;] however, you have no idea what serious jeopardy the church and the conference was in due to some of the decisions they made. I am speaking of both criminal and civil. You would not know because there was very little oversight and most people were sheltered from the truth. Had anyone on the [Staff Parish Relations Committee] been doing their job, these things would have either not happened or been uncovered long ago. I owe no-one an apology for telling the truth. Those who are making judgements without any facts are the ones who should apologize. Every word I have said is the truth. All of the dissenters can do is speculate and pontificate.
“You are right about one thing. There must be a coming together of everyone regardless of which side of this issue they are on in order for the church to *48 survive. The ministry is bigger than any of us and it is not about us.
“If I have misquoted Jim I welcome his comments and I will apologize.”
On July 1, 2011, Higgs sued Bole and other fictitiously named defendants[1] alleging claims of defamation, invasion of privacy, and intentional infliction of emotional distress. The complaint alleged that Higgs had been falsely accused of misappropriating funds belonging to COR; that defamatory statements had been made regarding that and other accusations; that, as a result of the allegedly defamatory statements, charges were filed against Higgs with the Conference, which resulted in an investigation; that, during the investigation, Higgs was asked to take a vacation from his duties with COR; that the Conference ultimately found that he was not at fault; and that, as a result of the allegedly defamatory statements, he was asked to refrain from further activities with COR.
On December 2, 2011, Higgs filed a “Civil Subpoena for Production of Documents under Rule 45,” for Reverend Schultz. In that subpoena, he requested all writings, e-mails, documents, and written communications in Reverend Schultz’s possession that made any reference to Higgs; that related to the finances or accounting of funds for COR and RDI for the past five years; that constituted “formal and/or informal complaints and/or charges against Lawton Higgs, Sr., whether in draft or final form”; that arose from the investigation of Higgs; that arose from an investigation into the finances and/or accounting of funds for COR and/or RDI; and that set forth Reverend Schultz’s job description, role, and duties with the United Methodist Church.
On December 29, 2011, Reverend Shultz filed a “Verified Objection to Civil Subpoena for Production of Documents and Motion to Quash,” in which he stated:
“8. By his complaint in this action, [Higgs] has charged Defendant Tom Bole with, inter alia, defamation and intentional infliction of emotional distress. These charges arise from information and documentation provided by Mr. Bole, at the request of Reverend Schultz, relating to [Higgs’s] service as pastor and, thereafter, as a full-time volunteer, of the Church of the Reconciler. [Higgs] charges specifically:
“ ‘As a result of the defamatory statements made by Defendants, complaints against [Higgs] were filed against [Higgs] with the North Alabama Conference of the United Methodist Church and an investigation ensued.’
“([Higgs’s] Complaint at ¶ 7).
“9. Without question, the information and documentation provided by Mr. Bole (and others) to Reverend Schultz prompted Reverend Schultz to initiate and conduct an investigation into the status of the records and financial condition of the Church of the Reconciler during the time [Higgs] served as pastor of the church, and, thereafter, when he continued to serve the church as a full-time volunteer.
“10. The investigation (including the participation by members of the Church of the Reconciler such as Mr. Bole) conducted by Reverend Schultz, in his capacity as District Superintendent of the South Central District of the North Alabama Conference of the United Methodist Church, is an internal, ecclesiastical matter of the United Methodist Church, which is guaranteed to be free from *49 judicial interference by secular courts pursuant to the Establishment and Free Exercise Clauses of the First Amendment.”
On January 17, 2012, Bole filed a motion to dismiss Higgs’s claims against him on the ground that the trial court lacked jurisdiction over the claims pursuant to the First and Fourteenth Amendment. Specifically, he asserted:
“In this case, church governance is at the heart of the matter, and both the Establishment Clause and the Free Exercise Clause are implicated. The Methodist Church’s investigation, proceedings, decision and action, as [Higgs] insists, ‘are central to this case’ (see Transcript of Hearing on Motion to Quash), and [Higgs] seeks to use these legal proceedings, indirectly if not directly, to inquire into and refute the Church’s investigation, proceedings, decisions and action, and to impose punishment on Tom Bole (and possible other Church members) individually for participating in the Church’s proceedings. This civil action affects both an entanglement with church governance and a chilling impact on individual free exercise through participation in that church governance.”
On March 15, 2012, after conducting a hearing,[2] the trial court entered an order denying Bole’s motion to dismiss. In its order, the trial court stated:
“This matter came before this Court on February 21, 2012 to hear oral arguments on Defendant Tom Bole’s Motion to Dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Alabama Rules of Civil Procedure. In response to Defendant’s Motion to Dismiss, [Higgs] must establish the factual predicates of jurisdiction by a preponderance of the evidence. Ex parte Safeway Insurance Company of Alabama, Inc., 990 So.2d 344 (Ala.2008) (citing Erby v. United States, 424 F.Supp.2d 180 (D.D.C.2006)).
“In his Motion to Dismiss, [Bole] argues that legal inquiry by the Court into [Higgs’s] claims would constitute an entanglement into matters of church governance (thus, ecclesiastical matters) and would violate the Establishment Clause and Free Exercise Clause of the First Amendment of the United States Constitution. It is undisputed that a civil court may not become involved in the resolution of disputes involving religious doctrine or practice. Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440 (1969). However, [Higgs] argues that the case at hand does not involve religious doctrine, practice, or any other matters of an ecclesiastical nature.
[[Image here]]

“II. Findings

“It is the finding of this Court that a legal inquiry by this Court into [Higgs’s] claims of defamation, invasion of privacy, and intentional infliction of emotional distress does not constitute an entanglement into matters of church governance (thus, ecclesiastical matters) and does not violate the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution. This case involves a civil claim by one layperson against another layperson, and neither the Church nor any clergymen are parties to this case. [Higgs’s] claims are based on evidence, including documents and verbal statements, which are wholly separate and apart from any church doctrine, belief, *50 or governance. The documents and statements that form the basis of [Higgs’s] claims were generated and made by [Bole] outside any ecclesiastical action taken by the Church. Specifically, the documents and statements were generated and made by [Bole] after a Church investigation was concluded and were made by [Bole] about [Higgs] separate and apart from any Church investigation.”
(Emphasis added.)
On April 5, 2012, the trial court entered an order granting Reverend Schultz’s “Verified Objection to Civil Subpoena for Production of Documents and Motion to Quash” to the extent it requested documents not provided to Reverend Schultz by Bole and denying it to the extent it requested documents provided to Reverend Schultz by Bole. Bole then filed his petition for a writ of mandamus in this Court seeking a dismissal of the action. Subsequently, Reverend Schultz filed his petition seeking to have his motion to quash granted in its entirety.

Standard of Review

‘“Mandamus review is available where the petitioner challenges the subject-matter jurisdiction of the trial court based on the plaintiffs alleged lack of standing to bring the lawsuit.
“ ““ “ ‘Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.’ Ex parte Integon Corp., 672 So.2d 497, 499 (Ala.1995). The question of subject-matter jurisdiction is reviewable by a petition for a writ of mandamus. Ex parte Flint Constr. Co., 775 So.2d 805 (Ala.2000).”.
“ ‘ “ ‘Ex parte Liberty Nat’l Life Ins. Co., 888 So.2d 478, 480 (Ala. 2003) (emphasis added). “When a party without standing purports to commence an action, the trial court acquires no subject-matter jurisdiction.” State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1028 (Ala.1999). Under such a circumstance, the trial court has “no alternative but to dismiss the action.” 740 So.2d at 1029.” ’
“ ‘Ex parte Richardson, 957 So.2d 1119, 1124 (Ala.2006) (quoting Ex parte Chemical Waste Mgmt., Inc., 929 So.2d 1007, 1010 (Ala.2005)).’
“Ex parte HealthSouth Corp., 974 So.2d 288, 292 (Ala.2007).”
Ex parte Board of Trs. of Old Elam Baptist Church, 983 So.2d 1079, 1085 (Ala. 2007).
“[A] mandamus petition may be used to review rulings on motions to quash subpoenas from parties and nonparties. In Ex parte Thackston, 275 Ala. 424, 426, 155 So.2d 526 (1963), the Alabama Supreme Court stated, ‘[t]his court has reviewed the issuance of a subpoena duces tecum, both as to parties and non-parties, or witnesses, on a petition for mandamus.’ See also State v. Reynolds, 819 So.2d 72 (Ala.Crim.App.1999).”
Ex parte Summit Med. Ctr. of Montgomery, Inc., 854 So.2d 614, 616 (Ala.Crim.App.2002).

Discussion

A. Bole’s Petition — case no. 1110868
Bole argues that the trial court erred when it denied his motion to dismiss Higgs’s claims against him for lack of jurisdiction. Specifically, he contends that the trial court did not have subject-matter jurisdiction over the claims pursuant to the *51 First and Fourteenth Amendments to the United States Constitution because, he says, “[t]he Methodist Church’s investigation, proceedings, decisions, and actions are at the very heart of [Higgs’s] claims, and the defenses thereto[ ] necessarily entail inquiry into the Methodist Church’s investigation and proceedings, and, therefore, into the motives, reasoning, perception, intent, and decisions leading to the disassociation of the [Higgses] from COR.”
In his response to Bole’s petition, Higgs argues that the First Amendment does not bar his action because the action is based on allegedly defamatory statements made after the Conference’s investigation had been completed and after the resolution had been issued and because, he says, the statements did not involve either the church, church governance, ecclesiastical matters, or any other form of religious concern but involved what he characterized as “alleged financial ineptitude.”
We first set out the elements of defamation, invasion of privacy, and intentional infliction of emotional distress.
“ ‘To establish a prima facie case of defamation, a plaintiff must show:
“ ‘ “[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).” ’
“Ex parte Crawford Broad. Co., 904 So.2d 221, 225 (Ala.2004) (quoting Delta Health Group, Inc. v. Stafford, 887 So.2d 887, 895 (Ala.2004), quoting in turn Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1091 (Ala.1988) (emphasis added)).
“Truth is a ‘complete and absolute defense’ to defamation. Battles v. Ford Motor Credit Co., 597 So.2d 688, 692 (Ala.1992) (citing Jakob v. First Alabama Bank of Montgomery, 361 So.2d 1017 (Ala.1978), cert. denied, 439 U.S. 968, 99 S.Ct. 460, 58 L.Ed.2d 428 (1978); Ripps v. Herrington, 241 Ala. 209, 1 So.2d 899 (1941)). Truthful statements cannot, as a matter of law, have a defamatory meaning. See McCaig v. Talladega Publ’g Co., 544 So.2d 875, 879 (Ala.1989) (‘Given the truthfulness of the published statements, the trial court correctly determined that the statements, as a matter of law, were not capable of having a defamatory meaning....’)....”
Federal Credit, Inc. v. Fuller, 72 So.3d 5, 9-10 (Ala.2011). With regard to invasion of privacy, this Court has stated:
“In Butler [v. Town of Argo, 871 So.2d 1 (Ala.2003) ], this Court defined the elements of the tort of invasion of privacy, stating:
“ ‘ “ ‘This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one’s private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.’ ” ...
[[Image here]]
“ ‘... [T]his Court has adopted the following definition for “false light” invasion of privacy:
“ ‘ “ ‘One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
“ ‘ “ ‘(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
*52 “ ‘ “ ‘(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.’ ”
“‘Schifano v. Greene County Greyhound Park, Inc., 624 So.2d 178, 180 (Ala.1993) (emphasis omitted) (quoting Restatement (Second) of Torts § 652E (1977)). A false-light claim does not require that the information made public be private; instead, the information made public must be false. See Restatement (Second) of Torts § 652E cmt. A. (1977).’
“871 So.2d at 12.”
Cottrell v. National Collegiate Athletic Ass’n, 975 So.2d 306, 348 (Ala.2007). The intentional infliction of emotional distress is also known as the tort of outrage. See Chaney v. Ala. West-AL, LLC, 22 So.3d 488 (Ala.Civ.App.2008).
“This Court first recognized the tort of outrage in 1980, in American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980). In Inmon this Court recognized the tort proposed by the Restatement (Second) of Torts § 46 (1948), holding:
“‘[Ojne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement[ (Second) of Torts § 46], at 78 [ (1948) ]. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72.’
“394 So.2d at 365. The Court noted in
Inmon that the tort of outrage
“ ‘does not recognize recovery for “mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.” Comment, Restatement, supra, at 73. The principle applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress.’
“394 So.2d at 364-65. As this Court has since held:
“ ‘The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, Whitt v. Hulsey, 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, National Sec. Fire & Cas. Co. v. Bowen, 447 So.2d 133 (Ala. 1983); and (3) egregious sexual harassment, Busby v. Truswal Sys. Corp., 551 So.2d 322 (Ala.1989). See also Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed.1996). In order to recover, a plaintiff must demonstrate that the defendant’s conduct “(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.” Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38, 44 (Ala.1990) (citing American Road Service Co. v. Inmon [, 394 So.2d 361 (Ala.1980) ]).’
*53 “Potts v. Hayes, 771 So.2d 462, 465 (Ala. 2000). That is not to say, however, that the tort of outrage is viable in only the three circumstances noted in Potts. Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy’s mother to counsel the boy concerning his stress over his parents’ divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy’s drug addiction. See O’Rear v. B.H., 69 So.3d 106 (Ala.2011). It is clear, however, that the tort of outrage is viable only when the conduct is “ ‘so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.’ ” Home v. TGM Assocs., L.P., 56 So.3d 615, 631 (Ala.2010) (quoting Inmon, 394 So.2d at 365).”
Little v. Robinson, 72 So.3d 1168, 1172-73 (Ala.2011).
With regard to a state court’s jurisdiction over a church in the face of a First Amendment challenge, this Court has stated:
“As is the case with all churches, the courts will not assume jurisdiction, in fact has none, to resolve disputes regarding their spiritual or ecclesiastical affairs. However, there is jurisdiction to resolve questions of civil or property rights. Williams v. Jones, 258 Ala. 59, 61 So.2d 101 (1952).”
Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746, 748 (Ala.1976). See also Walters v. Stewart, 838 So.2d 1047, 1050 (Ala.Civ.App.2002).
“[T]he following discussion from Lott [v. Eastern Shore Christian Center, 908 So.2d 922 (Ala.2005),] makes it clear that the decision of a church to discipline a member or to terminate an individual’s membership is reviewable in a civil court proceeding only under very limited circumstances ....
[[Image here]]
“As noted in Lott, under limited circumstances ‘this Court has reviewed the actions of churches in expelling members....’ 908 So.2d at 928. One of those circumstances is when a church member challenges whether her ‘expulsion was the act of the authority within the church having the power to order it.’ Abyssinia Missionary Baptist Church v. Nixon, 340 So.2d 746, 748 (Ala.1976) (emphasis added).”
Old Elam, 983 So.2d at 1090-93.
None of the parties have cited, and we have not found, any Alabama cases in which this Court specifically addressed whether courts have jurisdiction over claims of defamation, invasion of privacy, or intentional infliction of emotional distress based on statements that led to an investigation and the ultimate removal of a pastor and/or pastor emeritus from a church and statements made after the investigation in discussions about the results of the investigation and about actions taken by church hierarchy. However, courts from other jurisdictions have addressed similar situations.
In Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church in America, 860 F.Supp. 1194 (W.D.Ky.1994), Yaggie was the minister at Resurrection Lutheran Church, which was part of the Indiana-Kentucky Synod. The Indiana-Kentucky Synod was presided over by Bishop Ralph Kempski; Pastor Lowell Buss was a cleric-assistant to Bishop Kempski. The Church Council asked Buss to intervene and to help in a conflict between Yaggie and his parishioners. Subsequently, Buss and members of a ministry committee met with *54 the members- of Resurrection Lutheran’s congregation who were having problems with Yaggie. , Buss was also responsible for reporting to the Church Council about these meetings. In July 1992, Buss gave the ministry committee a draft of a report he proposed to submit to the Church Council. Yaggie objected to a paragraph in the draft, and it was deleted. However, that paragraph was the basis for one of Yaggie’s defamation claims. Yaggie sued the Indiana-Kentucky Synod and claimed that he had been defamed by two of its agents or employees.
Because the first attempt at reconciliation failed, Bishop Kempski, at Resurrection Lutheran’s request, appointed a three-member advisory committee to investigate the church’s difficulties and to formulate a recommendation for the resolution. After meeting with Bishop Kempski, Yaggie, and Yaggie’s wife, the advisory committee submitted a report to the congregation. That report stated:
“ ‘Since Pastor Lloyd Yaggie announced to the congregation on September 13 that he had asked that he ‘be put up for call’ and implied his subsequent acceptance of a call, the Advisory Committee recommends that his intention to resign be honored and that appropriate consultation for professional development and personal healing be offered at synod expense in order to facilitate the transition to a new ministry and ensure his future pastoral effectiveness.’ ”
860 F.Supp. at 1196-97. Yaggie argued that the language in the report regarding honoring his intention to resign was defamatory and inaccurate.
“Pastor Yaggie’s third and final claim concern[ed] a statement allegedly uttered by Bishop Kempski concerning the meaning of the report. Pastor Yaggie assert[ed] that when Bishop Kempski was asked about the Committee’s recommendation ‘that appropriate consultation for professional development and personal healing be offered,’ he responded by saying, ‘It means Pastor Yaggie’s going to Saint Barnabas for psychiatric treatment and evaluation.’ Pastor Yag-gie claim[ed] this statement was repeated verbatim on the following three occasions .... ”
860 F.Supp. at 1197.
The Indiana-Kentucky Synod moved to dismiss Yaggie’s complaint on the ground that the trial court did not have subject-matter jurisdiction and because, it argued, the complaint failed to state a claim upon which relief could be granted. In addressing this argument, the federal district court stated:
“The Supreme Court mandated over a century ago that this court was not to delve into matters concerning the inner ecclesiastical workings of the church:
“ ‘But it is a very difficult thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character, —a matter over which the civil courts exercise no jurisdiction, —a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them, —becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular ease before it, or that, in its judgment, it exceeds the powers conferred upon it or that the laws of the church do not authorize the particular form of proceeding adopted; and in a sense often used in the courts, all of those may be said to be questions of jurisdiction.’
“Watson v. Jones, 80 U.S. (13 Wall.) 679, 733, 20 L.Ed. 666 (1872).
*55 “Since the opinion in Watson, the Supreme Court has consistently refused to address church controversy. In Serbian Eastern Orthodox Diocese, etc. v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2872, 49 L.Ed.2d 151 (1976), the Court cited Watson for the proposition that federal courts lack jurisdiction to investigate whether proceedings pursuant to internal regulations of the church were procedurally or substantively defective. Id. at 711, 96 S.Ct. at 2381. The Serbian Court declined to interfere with the decision of the Holy Synod of the Serbian Orthodox Church (Mother Church) to suspend and ultimately remove a bishop of the church. The Court held:
“ ‘Consistently with the First and Fourteenth Amendments “civil courts do not inquire whether the relevant [hierarchical] church governing body has power under religious law [to decide such disputes].... Such a determination ... frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a [hierarchical] church so as to decide ... religious law [governing church polity] ... would violate the First Amendment in much the same manner as civil determination of religious doctrine.’
“Id. at 708-09, 96 S.Ct. at 2380 (quoting Md. & Va. Churches v. Sharpsburg Church, 396 U.S. 367, 369, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (Brennan J., concurring)).
“It is firmly established that in the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive. Gonzalez v. Archbishop, 280 U.S. 1, 16, 50 S.Ct. 5, 7-8, 74 L.Ed. 131 (1929). The general rule can thus be stated: Courts should be loath to assert jurisdiction over internal church disputes; its exceptions are rare. Serbian, 426 U.S. at 709-10, 96 S.Ct. at 2380-81; Presbyterian Church v. Hull Church, 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658 (1969).
“This court recognizes that none of the above cited decisions involved a defamation action brought by a minister against the hierarchy of his church. The importance we glean from each opinion is the Court’s extreme reluctance to interfere with the internal workings of the church. We are also cognizant of the fact that, in this case, the alleged defamatory statements do not express any religious principles or beliefs. However, the fact remains that this action is the result of a conflict confined within the Resurrection Lutheran Church, concerning the employment relationship of its minister, and addressed in accordance with the church constitution. As will be discussed, we find these circumstances dictate our lack of jurisdiction over the matter.
“A minister’s employment relationship is governed by ecclesiastical rule. Lewis v. Seventh Day Adventists Lake Region Conf., 978 F.2d 940, 942 (6th Cir. 1992). Civil court jurisdiction over a ministerial employment dispute is impermissible because such intervention would excessively inhibit religious liberty. Id. Only on rare occasions where there exists a compelling governmental interest in the regulation of public health, safety, and general welfare have the courts interfered in ecclesiastical matters. Simpson v. Wells Lamont Corporation, 494 F.2d 490, 493 (5th Cir. 1974).
“Not only is the interaction between a church and its pastor an integral part of *56 church government, but all matters touching this relationship are of ecclesiastical concern. Id. at 493-94. It makes no difference that the ecclesiastical dispute fails to touch on church or religious doctrine. Id. ‘Whose voice speaks for the church is per se a religious matter. We cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the gifts and graces of a minister must be left to ecclesiastical institutions.’ Minker v. Baltimore Annual Conf., 894 F.2d 1354, 1357 (D.C.Cir.1990). There is no exception to the bar against interfering with matters of church administration. Id.
“At least two courts have addressed the question of whether to exercise federal jurisdiction over a defamation claim and both have declined to do so. In Farley v. Wisconsin Evangelical Lutheran Synod, 821 F.Supp. 1286 (D.Minn.1993), the pastor of a Lutheran church in Bakersfield, California[,] brought a defamation action against the Wisconsin Evangelical Lutheran Synod CWELS’) after WELS allegedly published both oral and written defamatory statements about him during its attempt to remove him as pastor. The court rejected plaintiffs arguments ‘that resolution of his defamation claim would implicate no concern expressed in the First Amendment because an inquiry into the dispute requires no examination of church procedures or ecclesiastical decisions.’ Id. at 1290. Instead the court determined that resolution of the defamation claim would require the court to impermissibly review matters of religious concern. Id. A long list of authorities denying courts subject matter jurisdiction over internal church disputes mandated dismissal of the action. Id. at 1288-90.
“More importantly, the Sixth Circuit also dismissed a defamation claim for lack of subject matter jurisdiction in Hutchison v. Thomas, 789 F.2d 392 (6th Cir.1986). In Hutchison, an ordained Methodist minister challenged his enforced retirement under church disciplinary rules. The named defendants were the Bishop of the Methodist Church and three of his subordinates, the Judicial Council of the Church, the East Ohio Conference of the Church, and the Board of Ordained Ministry of the Conference. Among the causes of action asserted were claims for defamation, intentional infliction of emotional distress, and breach of contract.
“The plaintiff in Hutchison complained of several hearings which were conducted concerning his ability to relate properly to his congregation. He alleged that throughout the proceedings the defendants misrepresented his church relationships and defamed him by declaring him ‘unappointable’ due to recurring problems with local congregations. The Sixth Circuit unequivocally held that the courts could not constitutionally intervene in such a dispute:
“ ‘The Supreme Court of the United States has steadfastly upheld the First Amendment’s command that secular authorities may not interfere with the internal ecclesiastical workings and disciplines of religious bodies, although there may be occasions when civil courts can resolve disputes over the disposition and use of church property.’
“Id. at 393.
“The Hutchison court found that the plaintiffs claims related to his employment and status as a minister of the church. Id. at 396. The action therefore concerned internal church discipline, faith, and organization, all of which were governed by ecclesiastical rule, custom, or law. Id. The court *57 quoted with approval the Fifth Circuit opinion in Simpson [v. Wells Lamont Corp., 494 F.2d 490 (5th Cir.1974) ]:
“ ‘This case involves the fundamental question of who will preach from the pulpit of the church, and who will occupy the church parsonage. The bare statement of the question should make obvious the lack of jurisdiction of a civil court. The answer to that question must come from the church.’
“Id. at 894 (quoting Simpson, 494 F.2d at 492).
“Pastor Yaggie principally relies on Marshall v. Munro, Alaska, 845 P.2d 424 (1993), for the proposition that his defamation claims can proceed. In Marshall, the Supreme Court of Alaska reversed a lower court’s dismissal of Reverend Marshall’s defamation claim against a member of the church hierarchy. The court noted that ‘[m]ost cases are consistent in concluding that employment disputes within churches are core ecclesiastical concerns outside the jurisdiction of civil courts.’ Id. at 427. However, it then found that the dispute did not concern plaintiffs qualifications as a pastor and asserting jurisdiction over the defamation claim was proper.
“We choose not to follow the Marshall rationale. First, it appears to be internally inconsistent. Second, we cannot allow it to outweigh the substantial federal authority holding to the contrary. Pastor Yaggie cites us no federal cases in support of his position, and we have failed to find any on our own. This court declines to dismiss the lengthy list of federal precedent, including this circuit’s Hutchison decision, in favor of plaintiffs state court citations.
“The matters in this case concern the intimate relationship between a pastor and his congregation. In an attempt to resolve an inner church conflict, Lutheran leadership investigated congregational attitudes toward Pastor Yaggie. The investigation was done in accordance with the constitutional provisions of the church. The alleged defamatory statements were made in connection with the mediation process and strictly within the confines of the church.
“There can be no doubt that the matters in this case concerned the minister’s current and future employment relationship with the church. As such, they are matters of ecclesiastical concern, over which this court has no jurisdiction. Wisdom mandates that we refrain from dictating to a congregation that if they are unhappy with their religious leader they cannot freely speak their mind. In a mediation process between minister and congregation, all parties should be able to express their innermost feelings without fear of reprisal from the courts.
“If we were to accept jurisdiction over such matters, it would require us to delve into the church constitution and its procedures for settling internal disputes. If truth were a defense to the defamation claim, we presumably could face inquiry into determination of the minister’s effectiveness. Not only is this precisely what the First Amendment prohibits, but Supreme Court and Sixth Circuit authority prohibit us from exercising such jurisdiction were we so inclined. Accordingly, defendant’s motion to dismiss for lack of subject matter jurisdiction will be GRANTED.”
860 F.Supp. at 1197-1200 (capitalization in original).
In Trice v. Burress, 137 P.3d 1253 (Okla.Civ.App.2006), Trice, a member of Wesley United Methodist Church of Shawnee (‘Wesley”), had been employed as a youth director at Wesley. Burress was the senior minister at Wesley. Trice alleged that, on August 21, 2002, he was terminated as *58 the youth director “ ‘for reasons which are not clear to him’ that, “ ‘[subsequent to that time, Burress, acting in his capacity as Senior Minister of Wesley, told persons in the Church and in the community that [Trice] was terminated from his job because he was questioning his sexuality’”; and that Burress’s statements constituted slander. 187 P.3d at 1255. In their answer, Burress and Wesley denied that the statements had been made and alternatively asserted that the statements were either true or made on a conditionally privileged occasion. Subsequently, Burress and Wesley filed a motion for a summary judgment and attached materials to show that Trice had continued his membership at Wesley after his termination as youth director and that Burress had published the statement about Trice questioning his sexuality only to one young member of Wesley.
“In support of its motion, Church [3] asserted, inter alia, that the statement by Burress concerned the internal discipline of an existing member, and that the statement was published by Burress to only one member of the Church, all other publications having been by [Trice]. So, said Church, it was shielded from liability by the free-exercise-of-religion clause of the First Amendment to the United States Constitution. See, Hadnot v. Shaw, 1992 OK 21, ¶ 26, 826 P.2d 978, 987 [ (Okla.1992) ]; Guinn v. Church of Christ of Collinsville, 1989 OK 8, ¶ 21, 775 P.2d 766, 774 [(Okla. 1959) ]. Alternatively, Church argued, the alleged statement by Burress to other member(s) of the congregation regarding [Trice’s] termination constituted privileged eommunication(s) on matters of common interest. See, 50 Am.Jur.2d, Libel and Slander, § 340.[3] See also, Restatement of Laws, Second, Torts 2d, § 596 (1977), comment (e).[4]
“¶ 7 [Trice] responded, objecting to Church’s motion for summary judgment. [Trice] contested the allegation of a single publication by Burress, pointing to the deposition testimony of Ms. Heer which arguably showed the presence of one or two other young members of the congregation at the time Burress made the alleged defamatory statement. [Trice] also adduced notes from the meeting of Wesley’s governing board arguably demonstrating his termination for breach of policy and procedure governing the conduct and financing of youth outings, and further argued that Burress’ statement did not consequently concern the imposition of discipline for violation of any ecclesiastical doctrine of the Methodist Church. So, said [Trice], Burress’s statement stood outside First Amendment protections. Guinn, 1989 OK 8, ¶ 34, 775 P.2d at 779, fn. 48. *59 ing its orders and teachings, short of expressly or impliedly charging personal immorality or criminality....’ (Footnotes omitted.)
“[4] ‘The common interest of members of religious, fraternal, charitable or other non-profit associations, whether incorporated or unincorporated, is recognized as sufficient to support a privilege for communications among themselves concerning the qualifications of the officers and members and their participation in the activities of the society. This is true whether the defamatory matter relates to alleged misconduct of some other member that makes him undesirable for continued membership, or the conduct of a prospective member. So too, the rule is applicable to communications between members and officers of the organization concerning the legitimate conduct of the activities for which it was organized....”’
137 P.3d at 1256-57 (some footnotes omitted). Subsequently, the trial court granted Burress and Wesley’s motion for a summary judgment, and Trice appealed. In addressing the issue, the Oklahoma Court of Civil Appeals stated:
“¶ 12 The free-exercise-of-religion clause of the First Amendment to the United States Constitution guarantees a church the right, without fear of judicial interference, to impose on its members discipline for breach of ecclesiastical doctrine so long as the member remains a member of the church. Guinn [v. Church of Christ of Collinsville ], 1989 OK 8, ¶ 21, 775 P.2d [766,] 774 [(Okla. 1989) ]. Consequently, ‘[t]he First Amendment will protect and shield the religious body from [tort] liability for the activities carried on pursuant to the exercise of church discipline,’ and ‘[w]ithin the context of ecclesiastical discipline, churches enjoy an absolute privilege from scrutiny by the secular authority.’ Hadnot [v. Shaw], 1992 OK 21, ¶ 26, 826 P.2d [978,] 987 [(Okla. 1992)]; Guinn, 1989 OK 8, ¶21, 775 P.2d at 774. Only where the imposition of ecclesiastical discipline poses an immediate threat to ‘the public safety, peace or order’ is the mantle of absolute constitutional privilege shed. Guinn, 1989 OK 8, ¶¶ 14, 18, 775 P.2d at 770-771, 773.
“¶ 13 Trice argued, however, that the First Amendment offered no protection to defamatory statements unrelated to church discipline. In support, [Trice] pointed to both Guinn and Hadnot recognizing that, ‘ “[u]nder the banner of the First Amendment provisions on religion, a clergyman may not with impunity defame a person, intentionally inflict serious emotional harm on a parishioner, or commit other torts,’ ” and that, ‘[a]t the point when the church-member relationship is severed through an affirmative act either of a parishioner’s withdrawal or of excommunication by the ecclesiastical body, ..., the absolute privilege from tort liability no longer attaches.’ Guinn, 1989 OK 8, ¶ 34, 775 P.2d at 779, fn. 48; Hadnot, 1992 OK 21, ¶ 32, 826 P.2d at 989. So, said [Trice], because Burress’s statement came six months after the termination decision and did not accurately convey the governing board’s professed reasons for his termination, the First Amendment bar recognized in Guinn and Hadnot did not apply.
“¶ 14 We disagree. The statement of which [Trice] complained related to the ostensible reason for his termination, conveyed from the pastor to a member of the congregation concerning the conduct of another member. At least one court has specifically held that statements by and between church members ‘relating] to the Church’s reasons and *60 motives for terminating [parishioners’] membership’ ‘require an impermissible inquiry into Church disciplinary matters,’ and that the First Amendment precludes a member’s defamation ‘claim [which] clearly involves an internal conflict within the Church.’ Schoenhals v. Mains, 504 N.W.2d 233, 236 (Minn.App. 1993). We are persuaded that examination of Burress’s statement in the present case likewise requires an impermissible inquiry into Church disciplinary matters, barred by the First Amendment.
“¶ 15 Even if not absolutely barred by the First Amendment, Church is shielded from tort liability by a conditional or qualified privilege. In addition to the absolute immunity afforded by the First Amendment, a church or other religious organization ordinarily bears no tort liability for statements by or between church officers or members concerning the conduct of other officers or members, because ‘communications between members of a religious organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged’ as matters affecting a common interest or purpose. 50 Am.Jur.2d, Libel and Slander, § 340; Restatement of Torts 2d, § 596, comment (e). This is especially so where ‘the publication is made in response to a request rather than volunteered by the publisher.’ Restatement of Torts 2d, § 595(2)(a). So, where the alleged defamatory statements are exchanged by or between members of the congregation during or as result of either a church’s decision to employ, retain or terminate a clergyman or lay employee, or a church’s review of the performance of a clergyman or lay employee, the conditional privilege shields the church from liability for defamation. See, e.g., State ex rel. Gaydos v. Blaeuer, 81 S.W.3d 186 (Mo.App.2002); Singleton v. Christ the Servant Evangelical Lutheran Church, 541 N.W.2d 606 (Minn.App.1996) [10]; Joiner v. Weeks, 383 So.2d 101 (La.App.1980)[11]; Rankin v. Phillippe, 206 Pa.Super. 27, 211 A.2d 56 (1965)[12]; Slocinski v. Radwan, 83 N.H. 501, 144 A. 787 (1929).[13]
*61 137 P.3d at 1258-59 (footnotes omitted).
In Seefried v. Hummel, 148 P.3d 184 (Colo.App.2005), the plaintiffs, Richard Seefried, James Seefried, and Colorado Digital Systems, LLC (“CDS”), sued Hans Hummel, Kim Hummel, John Budish, and Fort Collins Bible Church (“the church”). They also sued Matt Homolka, Bob Herd, Dick Berg, Dan Stowell, and David Bis-ehoff, both individually and as members of the board of directors of the church. Richard was the senior pastor at the church, James was the associate pastor, and CDS was a corporation owned by James. Additionally, James had hired Hans and Kim Hummel and Budish to work at CDS. The first amended complaint alleged that Hans and Kim Hummel and Budish had “ ‘engaged in certain activities, which resulted in their cessation as employees [with CDS].’ That dispute subsequently became ‘an issue with the [church].’ ” 148 P.3d at 187. After several church meetings, the church terminated Richard’s employment, but it was unclear whether James had already resigned as associate pastor at that time. The complaint alleged that Richard had been discharged as pastor “based on this ‘secular non-church issue.’ ” Id.
The complaint set forth three claims for relief. However, the Colorado Court of Appeals stated:
“It is plaintiffs’ second claim that is at issue here. In this claim, plaintiffs allege that Richard Seefried had been employed with the church subject to an ‘express indefinite contract’ that contained ‘reciprocal duties of good faith and fair dealing.’ They further allege that, in violation of the church’s constitution and its contract of employment with Richard Seefried, the church and the board arranged a ‘public meeting’ with its members to discuss apparent discomfort with him as their pastor. Plaintiffs claim that, in violation of internal church procedure and its contract with Richard Seefried, all defendants participated in the meeting, signed petitions, or made false, slanderous, or libelous statements against plaintiffs, and that Richard See-fried was unlawfully terminated as a result of this meeting. Plaintiffs claim that as a consequence, all defendants are liable for ‘slander, libel, the intentional interference with business relationships, *62 and outrageous conduct’ for the statements made during this meeting.”
148 P.3d at 187. Subsequently, the defendants filed a motion to dismiss the claims against them on the grounds that the trial court did not have subject-matter jurisdiction and that the plaintiffs had failed to state a claim upon which relief can be granted. The trial court granted the motion in part and dismissed the plaintiffs’ defamation and related claims that were based on the statements published at the church meeting for lack of subject-matter jurisdiction. On appeal, the plaintiffs contended that the trial court erred when it refused to exercise jurisdiction over those claims. In addressing this issue, the Colorado Court of Appeals stated:
“As relevant here, the court determined that the statements which gave rise to plaintiffs’ claims were issued within the ‘constitutionally protected context’ of the First Amendment of the United States Constitution because they occurred during a church meeting that concerned the ‘investigation, discipline and discharge of Richard and James Seefried.’ The court, consequently, declined to exercise subject matter jurisdiction over these claims. Plaintiffs contend that this was error as a matter of law. We agree with the trial court.
“In certain circumstances, the First Amendment precludes a court from exercising jurisdiction over claims concerning a religious institution’s activities on matters of religious doctrine or authority. See, e.g., Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (court lacks jurisdiction to investigate whether internal regulatory proceedings of the church were proeedurally or substantively defective); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116, 73 S.Ct. 143, 154, 97 L.Ed. 120 (1952) (‘religious organizations [have] an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine’). The Colorado Supreme Court has recognized that courts have no authority to determine claims which directly concern a church’s choice of minister. Van Osdol v. Vogt, 908 P.2d 1122 (Colo.1996) (court lacked jurisdiction over claims brought by a former minister against a church arising out of the church’s decision not to employ the minister).
[[Image here]]
“... [T]he Van Osdol court held that once a court is called on to evaluate a religious organization’s discipline of its clergy, as was raised by the minister’s claims, both the Free Exercise Clause and the Establishment Clause of the First Amendment prohibit further inquiry.
“However, Van Osdol also recognized that the First Amendment is not an absolute bar to all claims against a religious institution. and that a minister’s claim against a church may be actionable if it can ‘be addressed without resort to ecclesiastical policy.’ Van Osdol v. Vogt, supra, 908 P.2d at 1128 n. 8, 1129, 1134 (“We do not by this opinion hold that churches are insulated from the law. We do not address various claims that could be brought by a minister against his or her church.’); see also Minker v. Baltimore Annual Conference, supra, 894 F.2d at 1360-61 (plaintiffs contract claim against church not automatically barred by the First Amendment where claim could potentially be addressed without analysis of church doctrine); Moses v. Diocese of Colo., 863 P.2d 310, 320-21 (Colo.1993) (claim of negligent hiring of a minister is actionable because it does not require *63 interpretation or weighing of religious belief).
“Colorado appellate courts have not addressed whether defamation, tortious interference, outrageous conduct, or similar types of claims, brought by a minister against his or her church or church members, are protected by the First Amendment. However, decisions from other jurisdictions that have addressed similar issues provide significant guidance. Based on these authorities, and in light of the policies expressed in Van Osdol, we conclude that, under the circumstances here, the trial court properly refused to exercise jurisdiction.
“In Heard v. Johnson, 810 A.2d 871 (D.C.2002), the District of Columbia Court of Appeals addressed a pastor’s defamation claim brought against the trustees of a church. In a thoughtful opinion, the court first observed:
“ ‘Under most circumstances, defamation is one of those common law claims that is not compelling enough to overcome First Amendment protection surrounding a church’s choice of pastoral leader. When a defamation claim arises entirely out of a church’s relationship with its pastor, the claim is almost always deemed to be beyond the reach of civil courts because resolution of the claim would require an impermissible inquiry into the church’s bases for its action.’
“Heard v. Johnson, supra, 810 A.2d at 888.
“After thoroughly reviewing the relevant case law, the court determined that, in most defamation cases, ‘the alleged defamatory statements did not overtly express any religious principles or beliefs, but all the actions resulted from conflicts “confined within” the churches involved.’ Heard v. Johnson, supra, 810 A.2d at 884. Concluding that the alleged defamatory statements would require an examination of the church’s reasons for dismissal of the plaintiff as pastor, the court declined to exercise jurisdiction over the claim. The court noted that, ‘it was impossible to consider the plaintiffs’ allegations of defamation “in isolation, separate and apart from the church[s] decision to terminate [the plaintiffs] employment.” ’ Heard v. Johnson, supra, 810 A.2d at 884 (quoting Jae-Woo Cha v. Korean Presbyterian Church, 262 Va. 604, 553 S.E.2d 511, 516 (2001)).
“Indeed, almost every court that has addressed the issue has determined that such claims could not be examined in isolation. See Farley v. Wisconsin Evangelical Lutheran Synod, 821 F.Supp. 1286, 1290 (D.Minn.1993) (‘Resolution of [the plaintiffs] claim would require the court to review [the church’s] bases for terminating him, an ecclesiastical concern, and the veracity of [the church’s] statements.’); Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church, 860 F.Supp. 1194 (W.D.Ky.1994) (court lacks jurisdiction over a minister’s defamation action against his synod based on statements made during resolution of a dispute between the minister and his congregation because such an analysis would have required the court to inquire into the inner ecclesiastical workings of the church), aff'd, 64 F.3d 664 (6th Cir.1995); Goodman v. Temple Shir Ami, Inc., 712 So.2d 775, 777 (Fla.Dist.Ct.App.1998) (‘The allegedly defamatory report and tortious interference occurred as part of this religious dispute and would require the trial court to weigh their effect on the board members as compared to the effects of the other considerations which clearly are religious disagreements. Inquiring into the adequacy of the religious reasoning behind the dismissal of *64 a spiritual leader is not a proper task for a civil court.’); Downs v. Roman Catholic Archbishop, 111 Md.App. 616, 683 A.2d 808, 812 (1996) (‘When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiffs fitness or suitability to enter into or remain a part of the clergy, however, it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church.’); Hiles v. Episcopal Diocese, 437 Mass. 505, 773 N.E.2d 929, 936 (2002) (‘matters arising out of the church-minister relationship, including church discipline, come within the category of religious belief, and thus are entitled to absolute protection’); Jae-Woo Cha v. Korean Presbyterian Church, supra, 553 S.E.2d at 506 (the plaintiffs allegations of defamation ‘cannot be considered in isolation, separate and apart from the church’s decision to terminate his employment’).
“Both Ogle v. Hocker, (E.D.Mich. No. 02-73200, Mar. 11, 2005) [ (not reported in F.Supp.2d) ], and Marshall v. Munro, 845 P.2d 424, 428 (Alaska 1993), in which the courts concluded that the First Amendment did not bar a defamation claim in the ministerial discharge context because the claim could be separated from the actual ministerial termination, are distinguishable. Unlike here, the statements in Ogle that gave rise to the plaintiffs claims were published outside of the ministerial employment and internal discipline process. Similarly, although the allegedly defamatory statements in Marshall appeared to play a role in the church’s decision not to hire the plaintiff, the court’s opinion apparently depended on its characterization of the offending statements as separate and apart from the ministerial employment process.
“Here, however, it is undisputed that the statements at issue were made in the context of a meeting convened by the church and its board for church members to discuss whether Richard Seefried should be terminated as pastor. Indeed, according to plaintiffs, Richard Seefried ‘was unlawfully and illegally terminated from his contract with defendant Church as a result of this meeting.’
“It does not matter whether, as plaintiffs allege, the offending statements were secular in nature or that James Seefried was not an associate pastor at the time the statements were made. The statements giving rise to plaintiffs’ defamation and other claims related directly to a church process that resulted in Richard Seefried’s termination as pastor. Accordingly, evaluation of the statements in isolation of this process, with respect to any of plaintiffs’ claims here, is not possible.
“Whether a statement has a defamatory meaning is predicated on context. See, e.g., Tonnessen v. Denver Publ’g Co., 5 P.3d 959, 963 (Colo.App.2000). Thus, the court here would be required to assess in its entirety a church meeting convened by the church to discuss dissatisfaction with, and the possible discharge of, its pastor. See Heard v. Johnson, supra, 810 A.2d at 886 (‘a court may not [consider the entire manual of grievances against the pastor] because ... it is impossible to analyze the entire manual without reference to the clerical employment dispute’).
“Similarly, if defendants were to raise a qualified, or ‘conditional,’ privilege defense, the court would be forced to determine whether defendants were acting *65 in good faith or with malice. See Coopersmith v. Williams, 171 Colo. 511, 516, 468 P.2d 739, 741 (1970). Resolution of this issue would require assessment, at a minimum, of the motives of the church members who uttered the allegedly defamatory statements. Such a determination could not occur without a subjective evaluation of their choice of spiritual leader.
“Likewise, plaintiffs’ claim[ ] of outrageous conduct ... cannot be considered separate and apart from the church’s termination proceedings. The outrageous conduct claim would require the court to determine whether defendants were acting recklessly or with the intent to cause plaintiffs severe emotional distress. See, e.g., Culpepper v. Pearl Street Bldg., Inc., 877 P.2d 877, 882 (Colo.1994). ... Such [an] inquir[y] here would necessarily insert a civil court into the basis for the church’s choice of its religious leaders.
“Furthermore, we have serious concerns that to allow as actionable church members’ comments about their church leaders made at church meetings would inhibit the free and open discourse essential to a religious institution’s selection of its minister. Such a result could chill expressions of dissatisfaction from church members and thereby intrude upon the autonomy of religious institutions to freely evaluate their choice and retention of religious leaders. See Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church, supra, 860 F.Supp. at 1199 (“Wisdom mandates that we refrain from dictating to a congregation that if they are unhappy with their religious leader they cannot freely speak their mind. In a mediation process between minister and congregation, all parties should be able to express their innermost feelings without fear of reprisal from the courts.’); Heard v. Johnson, supra, 810 A.2d at 887 (“Accusations of misconduct, discussions of [a pastor’s] misconduct within the church, and the emotional distress and exaggerated language that accompany such activities seem to us to be unavoidable parts of the difficult process by which dissatisfied churches end employment relationships with their pastors.’); Hiles v. Episcopal Diocese, supra, 773 N.E.2d at 937 (“The First Amendment’s protection of internal religious disciplinary proceedings [of a pastor] would be meaningless if a parishioner’s accusation that was used to initiate those proceedings could be tested in a civil court.’).”
148 P.3d at 188-91 (emphasis added).
In Anderson v. Watchtower Bible & Tract Society of New York, Inc., (No. M2004-01066-COA-R9-CV, Jan. 19, 2007) (Tenn.Ct.App.2007) (not reported in S.W.3d), the Tennessee Court of Appeals stated:
“Conduct that is inextricably tied to the disciplinary process of a religious organization is subject to the First Amendment’s protection just as the disciplinary decision itself. Callahan v. First Congregational Church of Haverhill, [441 Mass. 699, 714-15,] 808 N.E.2d [301,] 313-14 [(2004)]....
“The Andersons’ claims of intentional infliction of emotional distress and interference with business relationships arise directly from or are a direct result of the shunning. The bar to review of the ecclesiastical decision to terminate a person’s membership in a church extends to additional claims that derive from that decision or are inextricably linked to it. Burgess [v. Rock Creek Baptist Church ], 734 F.Supp. [30,] 34 [(D.D.C. 1990) ] (holding that plaintiffs claims of outrageous conduct based on church’s actions in preventing the plaintiff from *66 exercising rights of members when she was no longer a member were inextricably linked to the claims that her membership was wrongfully terminated and thus not justiciable).
“Regardless of the label given the claim by the plaintiffs, the question is whether a court must delve into ecclesiastical questions in order to resolve it. Natal [v. Christian Missionary Alliance ], 878 F.2d [1575,] 1577 [ (1st Cir. 1989) ]. If the harm alleged is the direct result of a religious practice or decision that courts cannot examine, there is no remedy available in the courts for such harm....”
(Emphasis added.)
In this case, Higgs was the pastor of COR until he retired. He continued to remain active as a volunteer with COR in his status as a “pastor emeritus.” Additionally, Higgs’s son, Kevin Higgs, was the senior minister of COR until he was transferred to Brownsville after the resolution was issued. As Higgs alleged in his petition, Bole’s March 18, 2011, letter to Reverend Schultz formed the basis for the Conference’s investigation into the Higgs-es. Further, it appears that the statements made after the resolution related to the discussion regarding Kevin’s transfer to Brownsville United Methodist Church and to the fact that Higgs would no longer be associated with COR. It also appears that the statements were made in response to concerns expressed by other church members regarding the actions taken by the Conference toward the Higgses.
Initially, we note that, in his brief to this Court, Higgs contends that his action dealt only with statements made after the Conference had issued its resolution. Also, in its order denying the motion to dismiss, the trial court stated: “Specifically, the documents and statements were generated and made by [Bole] after a Church investigation was concluded and were made by [Bole] about [Higgs] separate and apart from any Church investigation.” However, when reading the complaint, the excerpts of Higgs’s deposition, and Higgs’s third amended response to Bole’s interrogatories, it is clear that Higgs’s claims were not limited to statements made and e-mails sent after the conclusion of the investigation. In his complaint, Higgs alleged:
“6. In early 2011, [Higgs] was falsely accused by [Bole] of misappropriating funds, inter alia, belonging to the Church of the Reconciler. Defamatory statements were made in regard to this and other accusations through both verbal and written communications.
“7. As a result of the defamatory statements made by [Bole], complaints against [Higgs] were filed against [Higgs] with the North Alabama Conference of the United Methodist Church and an investigation ensued.
“8. While the investigation was being conducted, [Higgs] was forced to take vacation from his duties with the Church and to cease all activities with the Church.
“9. The Conference ultimately found that [Higgs] was not at fault.
“10. As a result of the defamatory statements made by [Bole], [Higgs] was asked to refrain from activities with the Church.”
Higgs further alleged:
“As a result of [Bole’s] said actions, [Higgs] suffered embarrassment, great worry, shame, humiliation, loss of sleep, anxiety, nervousness, sickness, physical and mental suffering, pain, anguish, and fright, the loss of his church family, and the loss of his position with the Church.”
(Emphasis added.) Additionally, Bole’s interrogatories asked Higgs to identify and *67 describe “each and every instance that ‘[Higgs] was falsely accused by [Bole] of misappropriating funds, inter alia, belonging to the Church of the Reconciler’ and each and every instance that ‘Defamatory statements were made in regard to this and other accusations through both verbal and written communications,’ which are alleged in Paragraph 6 of your Complaint.” In response, Higgs identified two e-mails dated May 31, 2011; a conversation between Bole and Marti Slay that took place on May 31, 2011; and Bole’s March 18, 2011, letter to Reverend Schultz.
Moreover, Higgs’s testimony during the deposition made it clear that his claims were based on more than just the statements made after the Conference had issued the resolution. During Higgs’s deposition, the following occurred:
“[DEFENSE COUNSEL:] All right. Now, you state generally in your complaint, in the next paragraph, paragraph 10, as a result of the defamatory statements made by defendants, plaintiff was asked to refrain from activities with the church. I take it you are referring to the resolution of complaint and the email attached to Exhibit Two from Ron Schultz that sets out the resolution and the action to be taken when you refer to being asked to refrain from activities with the church.
“[HIGGS:] I’m referring to this letter I got on March 31st.
[[Image here]]
“[DEFENSE COUNSEL:] Well, Exhibit One, I thought we understood, was your being asked to remove yourself. But that was temporary, while the investigation was being conducted.
“[HIGGS:] Yes.
“[DEFENSE COUNSEL:] All right. When in paragraph 10 you say that as a result of the defamatory statements made by defendants, plaintiff was asked to refrain from activities with the church, are you referring only to that temporary removal, or are you referring to the temporary removal and then the later action that was taken as set out in Exhibit Four, the resolution, and Exhibit Two, the email from Rev. Schultz?
“[HIGGS:] The Exhibit Two e-mail says Lawton will no longer be connected to Church of the Reconciler in any capacity.
“[DEFENSE COUNSEL:] Okay. So it is both of those actions taken by the church that you are referring to when you say you were asked to refrain from activities with the church?
“[HIGGS:] As well as the statement here given to me in the meeting.
“[DEFENSE COUNSEL:] The oral or verbal explanation, is that right ... ?
[[Image here]]
“[DEFENSE COUNSEL:] We are talking about two documents and then a verbal explanation of the resolution and the action, but it is all the same resolution and action we are talking about, isn’t it? It is that plus the temporary removal? Those are what you are talking about when you say you were asked to refrain from activities with the church.
“[HIGGS:] Yes.
“[DEFENSE COUNSEL:] Okay. I’m just trying to be clear. You go on in your next — your count one in the complaint, after referring to the prior things stated in your complaint, in paragraph 12, that as a result of defendants’ defamatory action, plaintiff suffered injury to his reputation in the eyes of his community and the public and was subjected to ridicule. Now, the injury to your reputation that you are talking about, can you tell me any particular persons that *68 you know of who now hold you in less regard?
“[HIGGS:] Yes.
“[DEFENSE COUNSEL:] Who?
“[HIGGS:] While having lunch after this event I was approached by a friend and associate in other ministries in the city and said, What will you be doing now, Lawton, that they won’t let you preach?’
[[Image here]]
“[DEFENSE COUNSEL:] Was her question one of concern?
“[HIGGS:] I couldn’t read her attitude about the question except that it just demonstrated to me that she, as a member of the public, as a result of all of these actions, assumed I’d been denied the privilege of preaching.
[[Image here]]
“[HIGGS:] I was just reporting to you what she said and what I heard that reflected public defamation of my character as a United Methodist preacher.
“[DEFENSE COUNSEL:] Did she say anything else?
“[HIGGS:] (Witness shakes head negatively.)
“[DEFENSE COUNSEL:] Was there anybody else, any other person that you can tell me that — Well, let me go back to her. Do you think she holds you in less regard, that lady?
“[HIGGS:] Do I think she holds me in less regard?
“[DEFENSE COUNSEL:] Yes.
“[HIGGS:] Yes.
[[Image here]]
“[DEFENSE COUNSEL:] Any other person?
[[Image here]]
“[HIGGS:] I’m delaying because I’m trying to think of the name, but I’m not sure I can. But some things expressed by more than one person, ‘Lawton, we still love you. We don’t care what you did.’
“[DEFENSE COUNSEL:] Who said that?
“[HIGGS:] That’s what I’m trying to remember, the name of a specific person.
“[DEFENSE COUNSEL:] This was another lady?
“[HIGGS:] I’m not sure. It has been expressed in a variety of settings by people.
[[Image here]]
“[DEFENSE COUNSEL:] Is there anything else that you can point me to that indicates there is an injury to your reputation?
“[HIGGS:] Yes.
“[DEFENSE COUNSEL:] What is it?
“[HIGGS:] I am asked by many people how are things going at the Reconci-ler. I tell them I’m no longer at the Reconciler. Their response is, ‘Why are you not at the Reconciler?’ I have to say that allegations were placed against me, and I was removed from activities there by the bishop.
[[Image here]]
“[HIGGS:] Many people know about it. There was an article in the paper.
[[Image here]]
“[DEFENSE COUNSEL:] What did it say?
“[HIGGS:] The headline was ‘Work at Reconciler will Continue,’ and it talked about there will no longer be a Higgs at the Reconciler.
“[DEFENSE COUNSEL:] What else did it say about the circumstances?
“[HIGGS:] Implicated that there were — There was so much information on all of this and the article in the paper *69 that I’m not able to make sure I’m accurate about what was said. It said that Kevin would be moved to Brownsville United Methodist Church, that I would no longer be involved with Church of the Reconciler but that we had been cleared of any complaints or allegations, that there were problems that they thought it necessary to remove Kevin and I from the church.
“[DEFENSE COUNSEL:] What newspaper was that?
“[HIGGS:] It was in The Birmingham, News.
“[DEFENSE COUNSEL:] Where did the reporter get his information? Do you know?
“[HIGGS:] From the bishop and the superintendent, primarily the superintendent, I think.
“[DEFENSE COUNSEL:] Do you know that because they were quoted in the paper?
“[HIGGS:] Yes. They were quoted in the paper.”
(Higgs’s deposition, at pp. 90-101.)
When asked if he was aware of and knew about anything that indicated any less regard for him in the eyes of the community and the public, Higgs stated:
‘Well, everybody that read these e-mails that [Bole] produced and I guess everybody that forwarded them on would shape a whole lot less opinion of me than they had before these e-mails were sent. And of course, all the names and e-mail addresses are on those e-mails. Also I — This resolution of complaint has a lot of derogatory statements about me.
“One of the reasons Kevin requested this resolution of complaint was that all of the people that he was appointed to serve at the Brownsville United Methodist Church didn’t think very much of him or me because of the article in the paper of serious problems for him.”
(Higgs’s deposition, at pp. 103-04.) Higgs further testified:
“Kevin requested that resolution of complaint that Ron Schultz said he would stand up and say there was nothing against us at annual conference. This is the resolution of complaint he received, which is quite different than that statement. And the chair of the pastor-parish committee at Brownsville United Methodist Church also requested a copy of the resolution of complaint. She was sent a copy of this. And this e-mail clearly would make her think less of me than before all of this.”
(Higgs’s deposition, at pp. 104-05.) When asked which e-mail he was referring to, he responded: “This resolution, this attachment.” (Higgs’s deposition, at p. 105.) Higgs also testified that, at Reverend Schultz’s request, the chair of the pastor-parish relations committee at Brownsville distributed the resolution to the entire membership at Brownsville and that that would cause the member of Brownsville Church and others “to think less of him that before all of this incident occurred.” (Higgs’s deposition, at p. 106.)
When asked about the ridicule he alleged in the complaint he had been subjected to, Higgs testified that a homeless person who had been an active participant in COR’s day program said something to him “around the attitude that unless you have done something wrong, you wouldn’t have had to leave the church.” (Higgs’s deposition, at p. 109.) When asked about any other incidents in which he had been subjected to ridicule, Higgs stated:
“Being removed from the church and from any relationships or conversations, I would get phone messages sometimes, calls, people trying to talk to me, expressing, you know, dissatisfaction or *70 ridicule, ‘Why aren’t you calling me back? Why aren’t you doing this?’”
(Higgs’s deposition, at p. 110.) When asked about how that was ridicule, Higgs responded, “ “You don’t care about me any more?’ You — that kind of ridicule.” (Higgs’s deposition, at p. 110.) Subsequently, during the deposition, the following occurred:
“[DEFENSE COUNSEL:] In your complaint you say that as a result of the defamatory statements, complaints were filed and an investigation ensued, that you in the course of that were forced to take vacation and cease all activities with the church, and as a result of the defamatory statements, you were asked to refrain from activities with the church. Then you have described for me, you know, some things related to what you feel reflects a less regard for you in the community and ridicule.
“And you state that as a result of defendants’ actions you suffered embarrassment and other mental anguish. Everything you told me seems to be related to the removal from the church, you know, the suffering you have described, the words that other people have stated to you, the article in the paper, the things that are said in emails, the church participant at the bus stop, the phone messages. Everything seems to be a consequence of the action the church took temporarily during the investigation and, ultimately, as you allege it, asking you to refrain from activities at the church. Is that accurate? Is that the source of the damage[ ] that you have described here in your complaint?
[[Image here]]
“[DEFENSE COUNSEL:] You can answer the question, Mr. Higgs. Are all of the things that you described as an injury to your reputation and the mental suffering you have had and the ridicule, everything I’ve heard you describe relates to your removal from the church. Is that accurate?
“[HIGGS:] No.
“[DEFENSE COUNSEL:] All right. Tell me what doesn’t relate to your removal from the church.
“[HIGGS:] The e-mails sent out—
“[DEFENSE COUNSEL:] How do they not relate to your removal?
“[HIGGS:] — are way beyond just removal from the church. There are things way beyond just removal from the church.”
(Higgs’s deposition, at pp. 112-14.) Subsequently, defense counsel asked Higgs about the invasion-of-privacy claims, and Higgs testified that the invasion-of-privacy claims were based, in part, on the inquiry into RDI’s finances. Specifically, he stated
“[HIGGS:] I do not have a copy of the allegations that were — that I read, but to the best of my recollection there were allegations from Mr. Bole that is referenced in this resolution of complaint where it says, ‘There was evidence that Rev. Higgs, Sr., overstepped his authority and directed Reconciler funds to be used to pay debts incurred by a 501(c)(3) established by Rev. Higgs, Sr., to address housing needs of the community.’ So the research into and the attempt to find information and made presumptions about that information based on the records of Reconciler Development, Incorporated, is what I’m referring to.
“[DEFENSE COUNSEL:] Who is conducting that investigation?
“[HIGGS:] In the production of the complaint that information was reported in the complaint.”
(Higgs’s deposition, at pp. 151-55.) When asked about how information and docu *71 ments regarding RDI invaded his right to privacy, he replied:
“Allegations were raised that were damaging to me by someone’s unauthorized acquisition of materials and records related to Reconciler Development, Incorporated.”
(Higgs’s deposition, at p. 157.) With regard to his invasion-of-privacy claim, Higgs also discussed his reputation and standing in the community. Asked if that was not a patently public thing and how was it private, Higgs responded:
“I’m a private individual. In the information that was gained about me, presumptuous things were assumed about it and spread abroad that damaged my reputation and standing in the community.”
(Higgs’s deposition, at p. 159.) Higgs also referred to his choice of church home with regard to the invasion-of-privacy claim. When questioned about this claim, Higgs ultimately stated: “And because of these actions, I had to experience interference with and disruption of a very private and personal choice, worship.” (Higgs’s deposition, at p. 161) (emphasis added).
It is clear that Higgs’s claims were not limited solely to statements made after the investigation had been completed and after the Conference had issued its resolution. Rather, Higgs’s claims are also based on the March 18, 2011, letter Bole sent to Schultz and the results of that letter — the Conference’s investigation, the Conference’s resolution, and his and Kevin’s removal from COR. It also appears that Higgs was attempting to use this litigation to delve into and litigate issues arising from the Conference’s investigation, the Conference’s resolution, and his and Kevin’s removal from COR. In fact, in his disclosure of expert witnesses pursuant to Rule 26, Ala. R. Civ. P., Higgs designated Wray Pearce as his expert and stated:
“Mr. Pearce is expected to testify with regard to the funds that [Bole] has alleged were misappropriated by [Higgs]. These allegations were the basis for [Bole’s] defamatory and harmful statements about [Higgs]. The funds include gifts to the Church of the Reconciler and to Reconciler Development, Inc. Mr. Pearce is expected to delineate the funds that were pledged to these entities from the funds that were actually given to these entities. With regard to the funds that were actually given to these entities, Mr. Pearce is expected to testify as to which accounts these funds were deposited and how they were designated.”
Further, Higgs’s testimony also make it clear that much of the harm he claims flowed from the Conference’s publication of the resolution and from his removal from COR. Finally, Higgs appears to rely on the statements in the resolution that the Conference did not find “evidence indicating a need to pursue formal charges against these ministers” to support his allegation that Bole’s statements were not true. However, in his affidavit, Reverend Schultz stated:
“The resolution of complaint in the matter concerning Plaintiff Higgs and the report of the results I sent by e-mail do not set forth all details of the Conference’s investigation, findings and reasoning. These were conducted in a confidential manner as much as was possible. All of the Conference’s proceedings, decisions and actions with regard to Plaintiff Higgs were in keeping and accordance with the Book of Discipline of the United Methodist Church (2008), which sets forth the doctrine, principles and the operational rules, regulations, policies and procedure of the United Methodist denomination.”
*72 Therefore, a determination into whether Bole’s statements were false would require an inquiry into details of “the Conference’s investigations, findings and reasoning.”
It is clear that Higgs’s claims were intertwined with the underlying investigation by the Conference, with the resolution, and with the Conference’s ultimate decision to remove Higgs and Kevin from COR. Any attempt to adjudicate Higgs’s claim would require an impermissible inquiry into the Conference’s investigation of the complaints against Higgs and Kevin, into the results of the investigation conducted by the Conference, into the factual findings that formed the basis for the resolution, and into the Conference’s decision to remove Higgs and Kevin from COR. See Yaggie, supra; Trice, supra; Seefried, supra; and Anderson, supra. Additionally, allowing the claims regarding Bole’s May 31, 2011, conversation with Slay and the two e-mails Bole sent on May 31, 2011, to proceed could have a chilling effect on communication among members of a congregation regarding church leadership.[4] See Seefried, 148 P.3d at 191. For these reasons, the trial court did not have subject-matter jurisdiction over Higgs’s claims against Bole by virtue of the First and Fourteenth Amendments to the United States Constitution. Accordingly, Bole has shown that he has a clear right to have Higgs’s claims against him dismissed for lack of subject-matter jurisdiction and to have the subpoena issued to Schultz quashed in its entirety.
B. Reverend Schultz’s Mandamus Petition — case no. 1110892
In case no. 1110892, Reverend Schultz sought a ruling “that the records subpoenaed by [Higgs] in this case are not due to be produced.” It appears that Reverend Schultz is attempting to challenge the trial court’s order denying in part his motion to quash Higgs’s subpoena.
We held in Part A of the “Discussion” section of this opinion that Bole is entitled to have Higgs’s claims against him dismissed for lack of subject-matter jurisdiction. Because the trial court lacked subject-matter jurisdiction in this case, the subpoena to Reverend Schultz was void, and Reverend Schultz’s petition for a writ of mandamus is moot.

Conclusion

For the above-stated reasons, we grant Bole’s petition and direct the Jefferson Circuit Court to vacate its order denying Bole’s motion to dismiss and to enter an order granting the motion to dismiss for lack of subject-matter jurisdiction. We dismiss Reverend Schultz’s petition as moot.
1110868 — PETITION GRANTED; WRIT ISSUED.
1110892 — PETITION DISMISSED.
*73 MALONE, C.J., and WOODALL, STUART, BOLIN, PARKER, MURDOCK, SHAW, and MAIN, JJ„ concur.

. Higgs did not substitute any named defendants for any of the fictitiously named parties.

. A transcript of this hearing was not included with Bole's petition.

. The Oklahoma Court of Civil Appeals referred to Burress and Wesley collectively as “Church.”

“3 ‘It seems apparent that the common interest of members of religious associations is such as to afford the protection of qualified privilege to communications between them in furtherance of their common purpose or interest. Thus, communications between members of a religious organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged. It has been said that a priest and his church have a mutual interest in preserving respect for, and obedience to, ecclesiastical edicts of their governing authority, with a qualified privilege to refute and negate the efforts of anyone publicly challeng-

“10 ‘The allegedly defamatory statements in this case, all of which the record reflects were communicated at task force meetings or Church council meetings and dealt with Singleton’s actions as a pastor, fall within the Church’s conditional privilege.’

“11 ‘To decide this case we must balance the right of an individual to protect his good name and reputation against the right of a religious organization to conduct its affairs free of civil court scrutiny or intrusion. The balance we strike favors the religious organization since we recognize that a qualified privilege exists which protects the actions of the Board and the statements made by the Board members during the December 10,1976, meeting.’

“12 ‘[I]n the instant case all of the members of the Chester church had a common interest in the controversies that occasioned the appointment of the ecclesiastical commission and its report. As the court below said: “Thus, the conditional privilege extends to the members of the Third Presbyterian Church, all of whom had a very real interest in the resolution of problems which had involved the handling of the church’s affairs. Publication could only have been excessive if it had been made to persons who did not have a common interest, and no such publication was made. [I]t is the duty of the court, not the jury, to rule on the question of conditional privilege, and, by definition, the *61 conditional privilege in this case extended to those in the Third Presbyterian Church. Publication to these members could not have been an abuse of that privilege.” The court properly determined, as a matter of law, that the communication was conditionally privileged.’

“13 ‘The idea that the conduct of a minister should be mentioned unfavorably only at church meetings, or before tribunals having authority in the premises, suggests an undesirable departure from the usual course of events.... Individual church members are not accustomed to bring the various items of gossip which may be in circulation about the minister to the attention of the governing boards of the church, nor is it desirable that they should do so.... [I]n-stances in which charges are presented and heard by the constituted church authorities evidence the culmination of considerable periods of private discussion amongst the members of the congregations involved. Any rule designed to penalize the formation of public sentiment in such cases by arresting the preliminary sifting of reports through private discussion, free from the taint of malice and for a proper purpose, is without justification and would be foredoomed to practical failure as an attempt to decree that men and women shall not act like human beings.” ’

. In his response to Bole’s motion to dismiss for lack of jurisdiction, Higgs included the bare allegation that the recipient list for the two e-mails Boles sent on May 31, 2011, included individuals who were not members of COR. However, the excerpts of Higgs’s deposition that were attached to the petition do not include any testimony indicating that some of the recipients of those e-mails were not members of COR. In his third amended answer to Bole’s interrogatories, Higgs listed the names of several individuals whom he believed received the e-mails in question. Higgs referred to those individuals as members or affiliate members of COR, leaders at COR, volunteers at COR, supporters of COR, interns at COR, volunteers with COR’s day program, and/or persons who had "worked to provide financial support and fundraising services for COR.” Higgs did not specifically state whether some of those individuals were actually members or associate members of COR. However, it is clear that, at the very least, those individuals were involved with COR and/or the United Methodist Church.